## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JAMAR CHISM, ASHLEY DEGRUY, KISSY ELLIOTT, WILLIAM GARRISON, MATTHEW MASTRACCI, ARTHUR RAY, MARK SILVER, and KENITH YATES, individually and on behalf of all others similarly situated, | Case No.: **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| GENERAL MOTORS LLC, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................1

II.   PARTIES ..........................................................................5

    A.    Plaintiffs ................................................................5

    B.    Defendants............................................................11

III.  JURISDICTION AND VENUE......................................12

IV.   GENERAL FACTUAL ALLEGATIONS .....................13

    A.    SDMs are supposed to detect crashes and control airbags
        and seatbelts. ..........................................................13

    B.    GM used a dangerous and defective SDM software
        calibration in its trucks and SUVs..........................17

    C.    GM knew that the SDM Calibration Defect was
        dangerous and unjustified but has failed to warn or
        compensate consumers. ...........................................22

        1.    Old GM recklessly downplayed serious risks of
            injury when it chose to include the SDM
            Calibration Defect in the Class Vehicles. .................24

        2.    The 45 millisecond cutoff was not necessary to
            protect against "late" airbag deployments. ...............27

        3.    GM knew about a pattern of suspicious accidents
            involving the SDM Calibration Defect but has
            done nothing to correct it. .........................................31

        a.    GM has litigated personal injury lawsuits for
            suspicious airbag failures in the Class
            Vehicles.....................................................................32

        b.    GM knew or should have known about
            hundreds of publicly reported airbag failures
            in the Class Vehicles. ................................................37

**TABLE OF CONTENTS**
**(continued)**

Page

D. Despite its knowledge, GM misrepresented and concealed important information about the SDM Calibration Defect and Class Vehicle safety .......................................65

    1. Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the SDM Calibration Defect. ..........................................66

    2. GM published owners' manuals for the Class Vehicles that detailed their safety features but did not disclose the SDM Calibration Defect. ...............................70

    3. GM marketed the Class Vehicles to be safe and reliable but failed to mention the SDM Calibration Defect. ......................................................................74

V. CLASS ACTION ALLEGATIONS ..............................................80

A. The Class Definition ..........................................................81

B. Numerosity: Federal Rule of Civil Procedure 23(a)(1) .....................83

C. Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) .........................................83

D. Typicality: Federal Rule of Civil Procedure 23(a)(3) ........................85

E. Adequacy: Federal Rule of Civil Procedure 23(a)(4) ........................86

F. Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2) ............................................................86

G. Superiority: Federal Rule of Civil Procedure 23(b)(3) ......................86

VI. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED .............................................................................87

VII. CAUSES OF ACTION ............................................................89

A. Claims Asserted on Behalf of the Nationwide Class .........................89

    NATIONWIDE COUNT I: FRAUD BY CONCEALMENT (Common Law) ...........................................89

# TABLE OF CONTENTS
## (continued)

Page

NATIONWIDE COUNT II: UNJUST
ENRICHMENT (Common Law) ...............................92

B.   State-Specific Claims ...........................................94

   i.   California .................................................94

CALIFORNIA COUNT I: Violation of
California Consumers Legal Remedies Act
Cal. Civ. Code § 1750, *et seq.* (On Behalf
of the California State Class) ....................................94

CALIFORNIA COUNT II: Violations of the
California Unfair Competition Law Cal.
Bus. & Prof. Code § 17200, *et seq*. (On
Behalf of the California State Class) ........................98

CALIFORNIA COUNT III: Violations of
the California False Advertising Law Cal.
Bus. & Prof. Code § 17500, *et seq*. (On
Behalf of the California State Class) ......................100

CALIFORNIA COUNT IV: Breach of
Express Warranty Cal. Com. Code §§ 2313
and 10210 (On Behalf of the California
State Class) .............................................................103

CALIFORNIA COUNT V: Breach of
Implied Warranty of Merchantability Cal.
Com. Code §§ 2314 and 10212 (On Behalf
of the California State Class) ..................................106

CALIFORNIA COUNT VI: Violation of
Song-Beverly Consumer Warranty Act, ................108

Breach of Implied Warranty Cal Civ. Code §
1790, *et seq*. (On Behalf of the California
State Class) .............................................................108

CALIFORNIA COUNT VII: Violation of
the Song-Beverly Consumer Protection Act, .........110

**TABLE OF CONTENTS**
**(continued)**

Page

    Breach of Express Warranty Cal Civ. Code
§ 1790, *et seq*. (On Behalf of the California
State Class)...............................................................................110

ii.   Florida .............................................................................................113

    FLORIDA COUNT I: Violations of the
Florida Unfair & Deceptive Trade Practices
Act Fla. Stat. § 501.201, *et seq*. (On Behalf
of the Florida State Class)........................................................113

    FLORIDA COUNT II: Breach of Express
Warranty Fla. Stat. §§ 672.313 and 680.21
(On Behalf of the Florida State Class)...................................116

    FLORIDA COUNT III: Breach of Implied
Warranty of Merchantability Fla. Stat.
§§ 672.314 and 680.212 (On Behalf of the
Florida State Class) ..................................................................118

iii.  Louisiana .........................................................................................120

    LOUISIANA COUNT I: Violations of the
Louisiana Unfair Trade Practices and....................................120

    Consumer Protection Law La. Stat. Ann.
§ 51:1401, *et seq*. (On Behalf of the
Louisiana State Class)..............................................................120

    LOUISIANA COUNT II: Breach of Implied
Warranty of Merchantability/ .................................................124

    Warranty Against Redhibitory Defects La.
Civ. Code Art. 2520, 2524 (On Behalf of the
Louisiana State Class)..............................................................124

iv.  Michigan ..........................................................................................125

    MICHIGAN COUNT I: Violations of the
Michigan Consumer Protection Act Mich.

**TABLE OF CONTENTS**
**(continued)**

Page

Comp. Laws § 445.903, *et seq.* (On Behalf
of the Michigan State Class)...................................125

MICHIGAN COUNT II: Breach of Express
Warranty Mich. Comp. Laws §§ 440.2313
and 440.2860 (On Behalf of the Michigan
State Class)................................................................129

MICHIGAN COUNT III: Breach of Implied
Warranty of Merchantability Mich. Comp.
Laws §§ 440.2314 and 440.2860 (On Behalf
of the Michigan State Class)...................................131

v.    North Carolina..........................................................133

NORTH CAROLINA COUNT I: Violations
of the North Carolina Unfair and Deceptive
Acts and Practices Act N.C. Gen. Stat. § 75-
1.1, *et seq.* (On Behalf of the North Carolina
State Class)................................................................133

NORTH CAROLINA COUNT II: Breach of
Express Warranty N.C. Gen. Stat. §§ 25-2-
313 and 252A-210 (On Behalf of the North
Carolina State Class)...............................................137

NORTH CAROLINA COUNT III: Breach
of Implied Warranty of Merchantability
N.C. Gen. Stat. §§ 25-2-314 and 252A-212
(On Behalf of the North Carolina State
Class)..........................................................................139

vi.   Ohio...........................................................................141

OHIO COUNT I: Violations of the Ohio
Consumer Sales Practices Act Ohio Rev.
Code § 1345.01, *et seq.* (On Behalf of the
Ohio State Class)......................................................141

# TABLE OF CONTENTS
## (continued)

Page

OHIO COUNT II: Violations of the Ohio Deceptive Trade Practices Act Ohio Rev. Code § 4165.01, *et seq.* (On Behalf of the Ohio State Class).................................................................146

OHIO COUNT III: Breach of Express Warranty Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313 (On Behalf of the Ohio State Class).................................................................149

OHIO COUNT IV: Breach of Implied Warranty of Merchantability Ohio Rev. Code §§ 1302.27 and 1310.19 (On Behalf of the Ohio State Class).........................................................151

    vii.    Texas ........................................................................153

TEXAS COUNT I: Violations of the Deceptive Trade Practices Act Tex. Bus. & Com. Code § 17.41, *et seq.* (On Behalf of the Texas State Class) ..............................................153

TEXAS COUNT II: Breach of Express Warranty Tex. Bus. & Com. Code §§ 2.313 and 2A.210 (On Behalf of the Texas State Class)..........................................................157

TEXAS COUNT III: Breach of Implied Warranty of Merchantability Tex. Bus. & Com. Code §§ 2.314 and 2A.212 (On Behalf of the Texas State Class)..........................................................159

VIII.    PRAYER FOR RELIEF ....................................................161

IX.    DEMAND FOR JURY TRIAL .......................................162

Plaintiffs Jamar Chism, Ashley DeGruy, Kissy Elliott, William Garrison, Matthew Mastracci, Arthur Ray, Mark Silver, and Kenith Yates, individually and on behalf of all others similarly situated (the "Class"), allege the following against General Motors LLC, General Motors Holdings LLC, and General Motors Company (collectively, "Defendants," "GM," or "New GM") based, where applicable, on personal knowledge, information and belief, and the pre-filing investigation of counsel and their experts.

## I.   <u>INTRODUCTION</u>

1.      Car crashes kill or seriously injure hundreds of thousands of people every year.  Because of this risk, the federal government requires automobile manufacturers to include critical safety features—seatbelts and airbags—in all vehicles sold in the United States. This life-saving equipment has been mandatory in passenger vehicles since 1997. *See* 49 U.S.C. § 30127.

2.      This case involves a dangerous defect that compromises these critical safety systems in millions of GM trucks and SUVs. When working properly, during a frontal crash of sufficient severity, the seatbelts should tighten to hold the vehicle occupants in place, and the airbags should inflate to protect them from hard impacts. A defect in GM trucks and SUVs, however, can *prevent* seatbelt tightening and airbag deployment during certain types of crashes, leaving vehicle occupants without protection exactly when they need it most.

3.      The defect is contained in the vehicles' airbag control unit, which is referred to by GM and herein as an "SDM" or "Sensing and Diagnostic Module." The defect itself is referred to herein as the "SDM Calibration Defect."

4.      The SDM is a small computer connected to sensors placed throughout the vehicle. These sensors tell the SDM when they detect irregular behavior and, based on these signals, the SDM will fire the airbags and tighten seatbelts when needed in a crash.

5.      In the Class Vehicles, the software program that controls the SDM was calibrated to prevent airbag and seatbelt deployment just 45 milliseconds after a crash has begun.[1] This has serious repercussions in real-world accidents that last longer than 45 milliseconds—such as accidents that involve multiple impacts, or that increase in severity over a period of time—in which the airbags and seatbelts in the Class Vehicles can fail.

6.      A team of software engineers from Delco Electronics—which designed the SDM software program in the Class Vehicles—expressly warned Old GM in 1999 that preventing airbag and seatbelt deployment after 45 milliseconds was a

---

[1] The "Class Vehicles" include all vehicles in the United States that contain the SDM Calibration Defect that were (1) manufactured, sold, distributed, or leased by Defendants or (2) manufactured, sold, distributed, or leased by Old GM and purchased or leased by Plaintiff or a Class member after July 10, 2009.

reckless and dangerous design decision.[2] Old GM's trucks group, which was in charge of design and development for trucks and SUVs, ignored this warning and insisted on using a defective SDM calibration that shuts off the airbags after 45 milliseconds. Tellingly, a separate team in charge of design and development for GM cars *rejected* this approach after hearing the Delco team's concerns, and included a much longer window (150 milliseconds) for the airbags and seatbelts to deploy in a crash for the vehicles they designed.

7.    When it was formed in 2009, General Motors, LLC ("GM LLC") acquired books, records, and personnel from Old GM that reflected this reckless decision to use the dangerous SDM calibration in its trucks and SUVs. Despite this acquired knowledge, GM continued to use Delco SDMs in its vehicles and, on information and belief, continued to use the defective calibration associated with those Delco SDMs as well.

8.    Since it was formed, GM has continued to gain knowledge of the defect through individual lawsuits, consumer complaints, and its own investigations into serious crashes where the airbags and seatbelts failed to deploy in the Class Vehicles. As an example, documents in a personal-injury lawsuit filed against GM

---

[2] As detailed further below, Old GM filed for bankruptcy in 2009, which led to the creation of the contemporary GM entities named as Defendants herein.

LLC in 2011 describe the defect in detail and relate Old GM's reckless decision to use it. *See* § IV.C.3.a, *infra*.

9.      Further, publicly available consumer complaints to the National Highway Traffic and Safety Administration ("NHTSA") detail more than **eight hundred** instances where the airbags and/or seatbelts suspiciously failed in the Class Vehicles during frontal crashes. Many of these reports specifically state that GM knew about and investigated the crash after the reported airbag failures. A separate NHTSA dataset indicates that, from 1999 to the present, at least 1,298 people were killed or injured in a frontal collision in which the airbags did not deploy in one of these vehicles. *See* IV.C.3.b, *infra*.

10.      Despite its knowledge of the defect and its impact on safety, GM has concealed the defect and failed to recall or repair the Class Vehicles, presumably to avoid the significant costs and inconveniences of recalling millions of vehicles. GM has hidden the defect in spite of its obligation to disclose it, misrepresented the Class Vehicles to be safe, and continued to sell them to consumers.

11.      Because of GM's failure to disclose the truth, consumers continue to purchase and drive Class Vehicles with the SDM Calibration Defect every day—on road trips, commutes, and weekend errands alike—unaware that their airbags and seatbelts may not operate in a prolonged frontal crash. This lawsuit seeks redress

from GM for the damages incurred when Plaintiffs and proposed Class members

paid for vehicles with a safety system that may fail in life-threatening collisions.

## II.   PARTIES

### A.   Plaintiffs

12.     Plaintiff Jamar Chism ("Plaintiff" for the purposes of this paragraph) is

an individual residing in Mooresville, North Carolina. In or around December 2012,

Plaintiff purchased a new 2012 Chevrolet Traverse (for purposes of Plaintiff's

allegations, the "Class Vehicle") from Hendrick City Chevrolet, an authorized

dealership located in Charlotte, North Carolina. At the time, Plaintiff reasonably

expected that the airbags and seatbelts would function in the event of a crash and had

no way of knowing that it contained a dangerous and defective SDM calibration that

could cause the airbags and seatbelts to fail during a crash. To the contrary, before

acquiring the vehicle, Plaintiff viewed Chevrolet's website, advertisements,

brochures, and commercials that touted the safety and reliability of Plaintiff's

vehicle and GM vehicles generally. Plaintiff also spoke to a salesperson at Hendrick

City Chevrolet prior to his purchase about the safety and reliability of the Class

Vehicle. GM concealed the existence of the defective SDM calibration from

consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle,

or would have paid less for it, if Defendants did not conceal material information

about the defective SDM calibration.

13.     Plaintiff Ashley DeGruy ("Plaintiff" for the purposes of this paragraph) is an individual residing in New Orleans, Louisiana. In May 2014, Plaintiff purchased a new 2014 Chevrolet Equinox (for purposes of Plaintiff's allegations, the "Class Vehicle") from Banner Chevrolet, an authorized dealership located in New Orleans, Louisiana. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed Chevrolet's website and saw Chevrolet advertisements that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

14.     Plaintiff Kissy Elliott ("Plaintiff" for the purposes of this paragraph) is an individual residing in Flint, Michigan. On or around April 2, 2018, Plaintiff purchased a used 2014 Chevrolet Traverse (for purposes of Plaintiff's allegations, the "Class Vehicle") from Al Serra Auto Plaza, an authorized dealership located in Grand Blanc, Michigan. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that

it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

15.     Plaintiff William Garrison ("Plaintiff" for the purposes of this paragraph) is an individual residing in West Palm Beach, Florida. On or around November 19, 2014, Plaintiff purchased a new 2014 Chevy Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Roger Dean Chevrolet, an authorized dealership located in West Palm Beach, Florida. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff specifically asked the salesperson at the dealership about the safety of the front and side airbags, and the salesperson confirmed the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers

including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

16.     Plaintiff Matthew Mastracci ("Plaintiff" for the purposes of this paragraph) is an individual residing in Okemos, Michigan. On or around September 2013, Plaintiff purchased a new 2014 Chevy Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Auto Choice Chevrolet Buick, an authorized dealership located in Bellaire, Ohio. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff reviewed information about the Class Vehicle safety online, including the Class Vehicle's rating on J.D. Power, which touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

17.     Plaintiff Arthur Ray ("Plaintiff" for the purposes of this paragraph) is an individual residing in Brentwood, CA. On or around January 22, 2010, Plaintiff

purchased a new 2010 GMC Sierra 2500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Concord GMC, an authorized dealership located in Concord, CA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

18.     Plaintiff Mark Silver ("Plaintiff" for the purposes of this paragraph) is an individual residing in Palmdale, California. On or around February 5, 2020, Plaintiff purchased a used 2014 Chevrolet 1500 Express Van (for purposes of Plaintiff's allegations, the "Class Vehicle") from a private party located in Palmdale, CA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed

or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

19.    Plaintiff Kenith Yates ("Plaintiff" for the purposes of this paragraph) is an individual residing in Fort Worth, Texas. In or around June 2019, Plaintiff purchased a used 2014 Chevrolet Silverado LD (for purposes of Plaintiff's allegations, the "Class Vehicle") from Moritz Chevrolet, an authorized dealership located in Fort Worth, Texas. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, in 2013 and 2014 Plaintiff recalls viewing advertisements and commercials for the Class Vehicle that touted the safety and reliability of the Class Vehicle and GM vehicles. Before acquiring the vehicle in 2019, Plaintiff conducted additional online research into the Class Vehicle. Plaintiff also spoke to a salesperson at Moritz Chevrolet prior to his purchase about the safety and reliability of the Class Vehicle. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff.

Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

### B. **Defendants**

20.    General Motors LLC ("GM LLC") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of GM LLC is General Motors Holdings LLC.

21.    General Motors Holdings LLC ("GM Holdings") is a Delaware limited liability company with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of GM Holdings is General Motors Company.

22.    General Motors Company ("GM Parent") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. GM Parent's only asset is its 100% ownership interest in GM Holdings. In public SEC filings, GM Parent states: "We design, build and sell cars, trucks, crossovers and automobile parts worldwide." GM Parent sells vehicles "through [its] dealer network to retail customers." As further noted in SEC filings,

GM Parent is also responsible for making reports to NHTSA related to vehicle safety and making determinations as to vehicle recalls.[3]

23.    Each of GM LLC, GM Holdings, and GM Parent operates out of GM's Global Headquarters in Detroit, Michigan.

24.    In June 2009, General Motors Corporation ("Old GM") filed for bankruptcy. Defendants were then created on or about July 10, 2009, in connection with the sale of substantially all of Old GM's assets pursuant to a Master Sale and Purchase Agreement. As a result of the sale, GM LLC acquired substantially all of Old GM's books, records, and personnel. GM LLC then transferred some of these assets to GM Holdings (formed shortly after the bankruptcy sale). Defendants thereby acquired from Old GM the knowledge about the SDM Calibration Defect (defined below) that those books, records, and personnel held. GM Parent and GM LLC also took responsibility for any necessary recalls of Old GM vehicles going forward.

25.    The causes of action in this Complaint are directed to GM Parent, GM Holdings, and GM LLC and are based on their misconduct.

III.    **JURISDICTION AND VENUE**

26.    This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one

---

[3] Quoted language from General Motors Company's Form 10-K for fiscal year 2019.

Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

27.     The Court has general personal jurisdiction over Defendants because they are headquartered in Detroit, Michigan. Mich. Comp. Laws § 600.705.

28.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are Michigan corporations and conduct substantial business in this district, and because a substantial part of the events and/or omissions giving rise to the claims occurred in this District.

## IV.   **GENERAL FACTUAL ALLEGATIONS**

### A.     **SDMs are supposed to detect crashes and control airbags and seatbelts.**

29.     Motor vehicles are required by federal law to use safety features to protect occupants in the event of a crash. These features include seatbelt pretensioners, which tighten seatbelts to secure the occupants, and airbags, which are cushions that rapidly inflate from the steering wheel and other areas of the vehicle. During an accident, seatbelt pretensioners hold vehicle occupants in place, and airbags buffer or prevent impact between occupants and hard structures in the vehicle. Without the airbags, slamming into the hard structures (such as the steering wheel) during a crash can cause serious injuries or death.

30.     When functioning properly, the combination of seatbelts and airbags is highly effective in reducing the safety risk in automobile collisions. NHTSA reports that the use of seatbelts and airbags reduces fatality risk by **61 percent** compared to an unbelted occupant in a vehicle without airbags.[4] From 1987 to 2017, an estimated 50,457 lives were saved because frontal airbags deployed during a crash.[5]

31.     Although airbags work effectively to protect occupants when necessary, they are not meant to deploy with every impact. A crash may be of lower intensity (e.g., a fender bender in a parking lot) such that the seatbelt alone will be sufficient protection for the occupant.[6] Airbags are designed to deploy in "moderate to severe" frontal or near-frontal crashes. A "moderate to severe" frontal crash is the equivalent of hitting a solid, fixed barrier at 8-14 miles per hour or higher.[7]

32.     Seatbelt and airbag systems are known as "passive" safety systems because, when they *are* needed, they are supposed to operate automatically (meaning, the driver does not need to hit a button to deploy the airbag). They use

---

[4] U.S. Department of Transportation, NHTSA, *Fatalities in Frontal Crashes Despite Seat Belts and Airbags*, NHTSA Technical Report No. DOT HS 811 202 (September 2009).

[5] *See* Exhibit D. NHTSA, Air Bags Overview. Available at: https://www.nhtsa.gov/equipment/air-bags (last visited August 4, 2021).

[6] Dr. Ching-Yao Chan, *Fundamentals of Crash Sensing in Automotive Airbag Systems*. Copyright Society of Automotive Engineers, (2000), at p. 50.

[7] *See* Exhibit D. Air Bags Overview, *supra* note 5.

-14-

sophisticated components and software to activate and deploy the seatbelts and airbags systems automatically.

33.     The "brain" behind this operation is the airbag control unit or "ACU" (also known as an Electronic Control Unit or "ECU").  GM refers to this component as the "Sensing and Diagnostic Module" or "SDM," and that term is used throughout this Complaint. SDMs are effectively computers that control the car's safety systems. They are intended, where necessary, to issue a "command" to deploy airbags and tighten seatbelts to prevent or mitigate injury to the vehicle occupants in a crash.

34.     The SDM operates in three basic phases. ***First***, during regular vehicle operation, the SDM is set in a resting or "normal" mode. In this mode, the SDM constantly receives signals from sensors placed throughout the vehicle, which collect and report information on inputs such as acceleration, wheel speed, brake pressure, and impacts.[8]  The SDM monitors and interprets these signals to determine whether the vehicle is involved (or about to be involved) in a crash.

35.     ***Second***, while monitoring these signals in "normal" mode, if and when the SDM detects an irregular input that suggests a potential crash, it "wakes up" to

_____

[8] *See* Exhibit E. Clemson University Vehicular Electronics Laboratory, "Airbag Deployment Systems." Available at:
https://cecas.clemson.edu/cvel/auto/systems/airbag_deployment.html (last visited August 4, 2021).

-15-

search for confirmation of a crash (as opposed to, for example, an irregular input from slamming on the brakes and then avoiding a collision). In this second stage—known as "wake up" or "standby" mode—the SDM's crash-sensing software algorithm is engaged to quickly decipher crash status.[9] After this "wake up" mode is initially triggered by an irregular input, if additional inputs confirm a moderate to severe frontal crash, the SDM should issue a command to "fire" the airbag and/or tighten the seatbelts as needed.[10]

36.     ***Third***, the final phase in this sequence is the "reset" phase. From "wake up" mode, after it detects that a crash or a potential crash has fully completed, (i.e., that the vehicle has returned to normal operation after an irregular input) the SDM ultimately returns to its normal operating state through "resetting."

37.     A vehicle striking a pothole illustrates this three-phase sequence. The vehicle first operates with the SDM in "normal" mode as it drives down the road. Then, suddenly, the driver hits an unseen pothole. This jolt from hitting the pothole (and/or related inputs like deceleration) will trigger the SDM to "wake up" mode where it searches for more inputs, quickly asking: "How fast is the vehicle slowing

---

[9] *See* Exhibit F. John Pearley Huffman, "The Physics of Airbags," *Car & Driver*, June 14, 2011. Available at: https://www.caranddriver.com/features/a15121591/the-physics-of-airbags-feature (last visited August 4, 2021).

[10] *See* Exhibit G. Jesse Kendall, P.E., and Kenneth Solomon, Ph.D., "Airbag Deployment Criteria" at p. 11. Available at: https://www.experts.com/content/articles/Kenneth-Solomon-Airbag-Paper.pdf (last visited August 4, 2021).

down? Is the front bumper crushed? Is the vehicle speeding back up normally?" and reacting in turn.[11]  If the SDM senses that the vehicle returns to normal operation and continues down the road, it will stop looking for confirmation of a crash and reset back to normal after it determines the danger has passed. On the other hand, if, after it hits the pothole, the vehicle veers out of its lane and crashes into another vehicle head on, the SDM should detect this second input and fire the airbag.[12]

38.    This entire sequence—from sensing an irregular signal (the pothole), to waking up and searching for confirmation of a crash, to firing the airbag where needed—might take only fractions of a second.  Indeed, a typical "crash duration" in a frontal, vehicle-to-barrier collision lasts for approximately 80-150 milliseconds (0.08-0.15 seconds).[13] For that reason, timing this sequence properly is critically important to ensure that the seatbelts are tightened and the airbags deploy to protect the occupants when they need to.

**B.    GM used a dangerous and defective SDM software calibration in its trucks and SUVs.**

39.    Throughout the three-phase sequence described above, SDMs rely on software algorithms to interpret signals, estimate crash dynamics, and issue a "deploy" or "do not deploy" command to the safety systems.  For the SDM to

---

[11] *See* Exhibit G, Solomon, *supra* note 10, at p. 11.

[12] *Id*. at p. 8.

[13] Chan, *supra* note 6, at p. 169.

function as intended, the software that controls it must be designed to recognize and react to crashes so that the airbags inflate when they are needed.

40.     Crash sensing occurs in "real-time," meaning that the sensing algorithm can only examine a limited window of data to predict and judge the severity of crash events *before* conclusion, so that the airbags can deploy and protect the occupant on impact.[14] A decision to "deploy" the airbags should occur when thresholds set to tell the SDM a crash is severe enough (i.e. a moderate to severe frontal collision) are met or exceeded. These deployment thresholds are programmed into the SDM software through a process in which engineers "calibrate" the software in the vehicle.

41.     In the Class Vehicles, the software calibration that controls how the SDM detects accidents and deploys the safety system contains a serious defect (the "SDM Calibration Defect"). Specifically, for frontal crashes, GM calibrated the SDM to *prevent* deployment of airbags and pretensioners more than 45 milliseconds after it enters "wake up" mode.  GM did this by increasing the deployment thresholds to unattainable values 45 milliseconds into the crash sequence.  With this calibration in place, no matter how severe the inputs the SDM received after 45 milliseconds, the airbags and pretensioners would not deploy.

---

[14] Chan, *supra* note 6, at p. 95.

42.     This defect was no accident; rather, as detailed below, GM included it *by design* when it modified the SDM software program (known as ALGO-S) in the Class Vehicles to include it.

43.     In affirmatively blocking these critical safety features after 45 milliseconds, GM greatly and needlessly increased the risk of injury and death in a variety of frontal crashes.  Specifically, the defect manifests in frontal crashes that endure for 45 milliseconds or longer, and require airbag deployment or seatbelt tightening after 45 milliseconds.

44.     For example, this includes frontal crashes with multiple, distinct points of impact known as "concatenated" events. A vehicle that first hits a curb and then veers and hits a tree, or first hits a speed bump and then crashes into the vehicle in front of it, are examples of concatenated crashes. By their nature, concatenated accidents involve multiple discrete inputs for the SDM to detect during a crash sequence.

45.     In concatenated crashes, the first part of the incident (hitting a curb) sends the SDM into its "wake up" or "stand by" mode.  The initial curb hit does not trigger the airbag or tighten the seatbelt, but the SDM "wakes up" to confirm whether further irregular signals will follow and indicate a need for the seatbelts or airbags. In the Class Vehicles—because of the software calibration that controls the SDM—the "wake up" mode lasts for just 45 milliseconds after the first irregular

signal. After that time, and by GM's design, the deployment thresholds in the software drastically increase, such that *no* further input, *no matter how severe*, could exceed the thresholds and trigger the airbag to deploy or seatbelts to tighten.[15]

46.     In addition to concatenated crashes, the defect is also implicated in frontal crashes that increase in severity and require airbag deployment or seatbelt tightening *after* an initial, "soft" impact.  These types of crashes are referred to herein as "prolonged" or "long-soft" crash onsets. This would include, for example, a crash into another vehicle's bumper which—because the bumper is comparatively "soft"—may take time before the "soft" bumper collapses, and a "hard" impact into the engine compartment begins.[16]  "Soft" crashes involve a "relatively long crash duration" that may last 20-50 percent longer than a head-on crash into a rigid barrier, like a cement wall.[17]

47.     In a prolonged onset crash, the initial impact into a "soft" surface, such as a bumper, starts the SDM clock ticking. Depending on the crash conditions such as speed, road incline, angle of impact, weather, ice on the road, etc., this "soft" impact may last longer than 45 milliseconds. Throughout the "soft" impact, the

---

[15] As detailed in this section, the triggering thresholds are pre-set inputs in the software that tell the SDM that a crash is severe enough to deploy an airbag.

[16] An example of a "soft" crash is where a vehicle crashes into a deformable barrier, or crashes at an angle, which will result in a "softer" impact than a head-on crash into a rigid barrier (which is a "hard" crash). Chan, *supra* note 6, at p. 40.

[17] Chan, *supra* note 6, at p. 40.

SDM will be in wake up mode to search for a confirmatory signal.  But, it will not find another input sufficient to trigger the airbags from the "soft" impact. As explained above, in the Class Vehicles, the SDM clock effectively times out when the 45 millisecond mark hits. So, if the crash proceeds through the "soft" layers and into the engine compartment of another vehicle at say, 70 milliseconds, no airbag or seatbelt deployment is possible no matter how severe the later, "hard" impact gets.

48.     In practice, this means that the airbags and seatbelt pretensioners in the Class Vehicles can only be fired within 45 milliseconds of a first, irregular signal. If a second signal occurs *after* 45 milliseconds, the SDM *purposefully, by design,* disregards signals that would otherwise trigger airbag deployment.

49.     The net result is a "dead zone" starting just 45 milliseconds into a crash, after which vehicle occupants are completely vulnerable. The dead zone lasts until the SDM detects that the crash has ended completely (meaning that the irregular signals have concluded, and the vehicle has resumed normal operation), and then resets back to normal mode.

50.     This significant gap in protection after 45 milliseconds is unreasonably dangerous because accidents—particularly complicated, real-world accidents—are not necessarily completed at that point. In many cases, a crash continues, and airbags and seatbelts are needed, well after that time. Yet, GM's SDM software calibration in the Class Vehicles makes it *impossible* for the airbags to deploy and seatbelts to

tighten in the "dead zone" in which a crash may still be underway—which is a serious, unjustified, and dangerous safety defect. Indeed, even GM's own cars division includes a significantly longer window for potential deployment.

### C.   **GM knew that the SDM Calibration Defect was dangerous and unjustified but has failed to warn or compensate consumers.**

51.    GM knew or had reason to know of the SDM Calibration Defect and the risks it entails from at least July 10, 2009, when GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective SDM software calibration those books, records, and personnel held. GM has continued to acquire knowledge—based on lawsuits implicating the SDM Calibration Defect and hundreds of publicly reported accidents with airbag and seatbelt failures—from 2009 to the present.

52.    Nonetheless, GM has continued to conceal this problem and the pattern of accidents, injuries, and deaths that have resulted from it. GM has failed to share this information with the consumers who paid for and drive these Class Vehicles every day.

53.    It should come as no surprise that GM has unreasonably and unsafely delayed disclosure of the SDM Calibration Defect. Indeed, GM has a recent history of attempts to avoid the costs, potential liabilities, and reputational harms from a safety recall for Takata airbags, and seems to have repeated that same tactic here.

54.     As is now public knowledge, millions of GM vehicles contain the dangerous and defective Takata airbag inflators that can explode with too much force and spray metal shrapnel into vehicle passenger compartments. While the dangers of these Takata airbags were widely known for years, GM lobbied regulators to delay a recall for its affected vehicles to avoid a resulting hit to its profits.[18] In 2016, GM reported that recalling its vehicles with Takata inflators would cost hundreds of millions of dollars.[19]

55.     Consumers brought a putative class action seeking redress. *See In re Takata Airbag Product Liability Litigation*, Case No. 14-cv-240009, Dkt. 2750, (S.D. Fl.). While other vehicle manufacturers had earlier and voluntarily recalled their vehicles with Takata airbags, it was only years later, with that consumer litigation pending, that GM finally issued a belated recall. And importantly, it did so *only after* regulators from NHTSA denied GM's petition for inconsequentiality, in which it attempted to argue that a recall was not necessary.[20]

---

[18] *See* Exhibit H. "GM seeks to delay recall of 1 million vehicles with Takata air bag inflators." *Reuters*, September 16, 2016. Available at: https://www.reuters.com/article/us-gm-recall/gm-seeks-to-delay-recall-of-1-million-vehicles-with-takata-air-bag-inflators-idUSKCN11M27N (last visited August 4, 2021).

[19] *Id.*

[20] *See* Exhibit I. "GM will recall 7 million vehicles for air bag issue worldwide." *Reuters*, November 23, 2020. Available at: https://www.reuters.com/article/us-gm-recall/gm-will-recall-7-million-vehicles-for-air-bag-issue-worldwide-idUSKBN2831TH (last visited August 4, 2021).

56.     Here, as in Takata, GM knew or should have known that the SDM software calibration in the Class Vehicles—which includes a dead zone that prevents the airbag and seatbelts from deploying after 45 milliseconds—was dangerous. Nonetheless, GM kept using it anyway, did not recall or repair the Class Vehicles to correct it, and *still* has not told consumers about it.

### 1.     Old GM recklessly downplayed serious risks of injury when it chose to include the SDM Calibration Defect in the Class Vehicles.

57.     In general, the vehicle manufacturer sets the deployment thresholds in the SDM software calibration that will trigger a command to fire the airbags and/or tighten the seatbelts. The vehicle manufacturer uses results from laboratory crash testing to inform these parameters.[21]

58.     But laboratory results are not sufficient in themselves, because real-world accidents—which can occur from multiple angles and involve inputs from myriad variables like weather, temperature, or incline—will differ from the testing environment.[22] For that reason, manufacturers must exercise appropriate care to design crash sensing frameworks that function to keep people safe in the real world.

59.     Old GM worked with an external team of engineers from Delco Electronics (later called Delphi Electronics) to develop the SDM software program used in the Class Vehicles, starting with Model Year 1999. The team from Delco

---

[21] *See* Exhibit F, Huffman, *supra* note 9.
[22] *See* Exhibit G, Solomon, *supra* note 10, at 13.

developed a proposed software program, known as ALGO-S, which it presented to Old GM for review.

60.     During this time, Old GM divided the design and development of its vehicles into a "cars" group and a "trucks" group, with the trucks group responsible for design, development, and production of larger model trucks and SUVs. After it reviewed the Delco team's proposed SDM software algorithm, ALGO-S, the trucks group insisted on adding the 45 millisecond cut off described above when it calibrated that program for use in its trucks and SUVs.  On information and belief, the trucks group proposed this cutoff based on test results which indicated that frontal-barrier accidents in its trucks and SUVs would be complete within 45 milliseconds or less *in laboratory conditions*.

61.     In response, the Delco team expressly warned the trucks group that such an aggressive cutoff could fail to capture additional signals in complex crashes outside of the laboratory, leaving occupants completely unprotected during prolonged onset crashes or crashes with multiple impact points. The trucks group insisted, however, and the 45 millisecond cutoff was added in the SDM software calibration for GM trucks and SUVs.

62.     On information and belief, documents, records, and personnel reflecting GM trucks' insistence—over Delco's objection—to include this cutoff were passed on from Old GM to New GM in 2009.  On information and belief, other

-25-

major vehicle manufacturers throughout the industry include a significantly longer window for the SDM to detect a potential accident and deploy the airbags and seatbelts.

63.     Indeed, in the ALGO-S program as it was designed by Delco, the window in which the airbags and seatbelts can deploy in a crash is up to at least 150 milliseconds—over *three times* the interval that GM trucks added in the defective calibration.  Tellingly, after the Delco team repeated the same warnings about the truck group's proposed 45 millisecond cutoff to GM's cars group, the cars group rejected the shorter cutoff. Instead, the cars group used the ALGO-S software with the Delco-recommended period of 150 milliseconds for deployment.

64.     Delco's original 150 millisecond window allows for airbag and seatbelt deployment in real-world frontal crashes, which themselves can endure for up to 150 milliseconds.[23] When GM trucks added the defective 45 millisecond cutoff to the software calibration in the Class Vehicles, it prematurely, and dangerously, prevented the airbags and seatbelts from functioning when a frontal crash may still be well underway.

---

[23] Chan, *supra* note 6, at p. 169.

2.   **The 45 millisecond cutoff was not necessary to protect against "late" airbag deployments.**

65.   GM trucks group's insistence on the 45 millisecond window after which the airbags and seatbelts cannot deploy was unjustified and unsafe.

66.   On information and belief, the trucks group chose to set this aggressive cutoff due to concerns about the potential for airbags to deploy "too late" during an accident. But as the trucks group also knew, these concerns were unwarranted given technology that mitigated the risks of "late" airbag deployments.

67.   A brief history of airbags in motor vehicles puts this reckless decision in context. Before 1998, airbag systems were effectively one-size-fits-all. Designed to protect against only frontal crashes, these "first-generation" airbags were built to meet a standardized government test that required they protect an unbelted, midsize adult male dummy (175 pounds) in a 30-MPH crash into a rigid barrier.[24] To do so, an airbag had to fill up quickly with gas, resulting in a deployment speed of up to 200 MPH.[25]

---

[24] *See* Exhibit J. Jack Keebler, *Airbags Safe Insane? – Special Report*, Motortrend (Sept. 1, 2000), https://www.motortrend.com/news/airbags-safe-insane-special-report/ (last visited August 4, 2021).

[25] *Id.*; *see also* Exhibit K, David B. Ottaway & Warren Brown, *From Life Saver to Fatal Threat*, The Wash. Post (June 1, 1997), https://www.washingtonpost.com/archive/politics/1997/06/01/from-life-saver-to-fatal-threat/56d05b9e-a1bc-49b7-beb4-43480762b25e/ (last visited August 4, 2021).

68.     Not all vehicle occupants fit this description, however, and the intensity of first-generation airbag deployment could prove dangerous for children and those who were positioned too close to the bag when it inflated (for example, because they had already been thrown forward toward the steering wheel during an under-way accident).[26]

69.     Public perception about airbag safety in motor vehicles, and in turn, the vehicle manufacturers that sold them, turned increasingly unfavorable following reports of late and aggressive deployments in first generation airbags. Both regulators and vehicle manufacturers recognized the need to address these issues.[27] Beginning in October 1995, NHTSA initiated a series of actions to minimize and eventually eliminate the adverse effects of late and aggressive airbag deployments while preserving their life-saving benefits.[28]

70.     In 1997, NHTSA issued modified federal rules to allow automakers to reduce the energy in frontal airbags. This led to "an industry-wide changeover" to

---

[26] Susan A. Ferguson & Lawrence W. Schneider, *An Overview of Frontal Airbag Performance with Changes in Frontal Crash-Test Requirements: Findings of the Blue Ribbon Panel for the Evaluation of Advanced Technology Airbags*, Traffic Injury Prevention 3 (Nov. 2008).

[27] U.S. Department of Transportation, NHTSA, *An Evaluation of the 1998–1999 Redesign of Frontal Air Bags,* NHTSA Technical Report No. DOT HS 810 685, p.11, (August 2006) [hereinafter "NHTSA Redesign Report"]; *see also* Ferguson & Schneider, *supra* note 26.

[28] NHTSA Redesign Report, *supra* note 27, at vii.

"redesigned" airbags in the very next model years (1998-1999).[29] The "redesign" consisted of several new technology innovations. The first and immediate solution was "depowered" airbags: automobile manufacturers removed some of the gas-generating propellant or stored gas from the inflators to reduce the pressure and velocity of deployments. This change alone was highly effective in reducing low-to-moderate speed fatalities.[30]

71.    Other innovations to reduce the risk of aggressive deployments included reducing the volume or rearward extent of airbags, positioning them further from occupants, revised folding techniques, and tethering and shifting from pyrotechnic inflators to hybrids including stored gas.[31]

72.    Old GM knew about and employed these new technologies in its vehicles. Indeed, as the director of Old GM's Safety Center Terry Connolly said in 2000, there were no significant downsides to using this new "depowered" airbag technology, even for unbelted passengers.[32]

---

[29] *Id.*; *see also* Exhibit L. Micah Wright, *The Hidden Dangers of Older Airbags*, MotorBiscuit (May 8, 2015), https://www.motorbiscuit.com/the-hidden-dangers-of-older-airbags (last visited August 4, 2021).

[30] *See* NHTSA Redesign Report, *supra* note 27 at 25.

[31] *Id.* at vii.

[32] *See* Exhibit J, Keebler, *supra* note 24.

73.     Further innovations referred to as "advanced" or "smart" airbags followed soon thereafter.[33] "Advanced" airbags alter deployment patterns according to feedback from a number of sensors. These sensors tailor how the airbag deploys based on the severity of the crash, the size and posture of the vehicle occupant, whether the occupant is wearing a seatbelt, and how close the occupant is to the airbag. [34]

74.     Many "advanced" systems use dual-stage or multi-stage inflators. This means that they have two inflation stages that can be ignited sequentially or simultaneously depending on crash severity.

75.     "Advanced" airbags were phased into production beginning September 1, 2003 and were required in all new vehicles by September 1, 2006.[35]

76.     Thus, based on the depowered and advanced airbag technology starting in 1998 and 1999, the risks posed by "late" deployments in early generation airbags had greatly diminished. Indeed, while NHTSA estimates that more than 290 deaths were caused by frontal airbag inflation between 1990 and 2008, nearly *90 percent* of those deaths occurred in vehicles manufactured *before* 1998 (i.e. with first

---

[33] *See* NHTSA Redesign Report, *supra* note 27 at p. 3.

[34] *See* Exhibit L. Wright, *supra* note 29.

[35] NHTSA Redesign Report, *supra* note 27, at vii.

generation airbag technology).[36] Today, with this new technology, serious injuries from properly functioning airbags are rare.[37]

77.     Despite knowledge and use of the new technology mitigating the risks of late deployments, the trucks group *still* insisted on shutting off the airbags and seatbelts in the Class Vehicles after 45 milliseconds. On information and belief, despite these well-established advancements in airbag technology outlined above, GM continued to use this same defective software algorithm in its vehicles in 2009 and beyond.[38]

78.     This reckless decision and continued disregard for clear warnings about the risks in shutting off the SDM too soon during an accident has had real and tragic consequences.

### 3.     GM knew about a pattern of suspicious accidents involving the SDM Calibration Defect but has done nothing to correct it.

79.     As outlined above, GM has known about the SDM Calibration Defect since it took over Old GM's books, records, and personnel in 2009. GM has continued to accrue knowledge of the defect, and its serious consequences, in the years since. Indeed, GM has known about, investigated, and even litigated numerous

---

[36] *See* Exhibit M. Insurance Institute for Highway Safety. "Airbags" (2021), available at: https://www.iihs.org/topics/airbags (last visited August 4, 2021).
[37] *Id.*
[38] Publicly available crash data reports from NHTSA indicate that the Delco SDM was used in GM trucks vehicles up through at least MY 2015.

crashes in which airbags suspiciously failed to deploy in multi-impact or prolonged onset frontal crashes in the Class Vehicles—a clear indication of the SDM Calibration Defect.

80.     Despite obvious signs of a known and dangerous risk, GM concealed these accidents and the SDM Calibration Defect from consumers and regulators to avoid or at least delay a recall and the attendant costs and reputational damage therefrom. To date, GM has taken no corrective action to repair or recall the Class Vehicles to address this defect.

### a.     GM has litigated personal injury lawsuits for suspicious airbag failures in the Class Vehicles.

81.     In addition to its institutional records and knowledge, GM was on notice of the SDM Calibration Defect through litigating personal injury lawsuits involving airbag and seatbelts failures consistent with the SDM Calibration Defect.

82.     In one case filed in 2011—just two years after GM was formed—plaintiff James Nossar sued GM LLC following a crash in his 2005 Chevrolet Trailblazer (a Class Vehicle here). As detailed in that complaint, on or about February 25, 2010, Mr. Nossar drove his Trailblazer into the back of a 1999 Suburban "and sustained a moderate to severe frontal impact . . . at a rate of speed that exceeded the airbag system's predetermined deployment threshold." *See Nossar v. General Motors LLC*, Dkt. 4, Case No. 1:11-cv-02129 (N.D. Ga.). Despite this "significant frontal collision," the airbag failed to deploy and seatbelt pretensioners

failed to trigger. Without the airbag or seatbelt to protect him, Mr. Nossar's head slammed into the steering wheel, which caused "fracturing practically every bone in his face and brain injuries." *Id.*

83.    In support of his claims, in April 2012, Mr. Nossar filed an expert report from Chris Caruso.  Mr. Caruso is an expert in automotive crash sensing systems and worked for Delco engineering during the development of the defective SDM software in the Class Vehicles. *See id.* at Dkt. 40-2.

84.    In that report, Caruso detailed the same flaws in the SDM software calibration described herein. He explained that the airbag sensing system in the Trailblazer was "defective by design and has the potential to not deploy frontal impact airbags in high speed frontal impacts where conditions vary slightly from the perfect laboratory conditions where the system was designed and tested."  Based on Caruso's experience working in the development of the SDM software, he related that there were concerns, due to the calibration, **"that in longer duration, but high severity events and in concatenated events (such as a curb impact followed by a utility pole impact), the airbags would fail to deploy because the algorithm deployment thresholds were no longer active**." *Id.*

85.    Caruso further related that as that litigation proceeded into discovery, he would "expect to identify emails and other correspondence between GM Truck Engineers and Delphi Crash Sensor engineers discussing the **concerns over GM**

-33-

**Truck Groups' edict to set certain crash sensor calibration parameters outside the recommended minimum guidelines set by the crash sensing algorithm designers** [i.e. the Delphi/Delco engineers]." Caruso "ha[d] seen these documents before and kn[e]w the content," and summarized that "**the calibration values result in premature turning off of algorithm thresholds which effectively disables the front airbags after 45 to 50ms**." *Id.* (emphasis added).

86.     As to Mr. Nossar's crash specifically, Caruso concluded that the airbags and seatbelts failed because, at the time the airbags should have deployed, "the SDM calibration had already timed out after 45-ms after the crash started." Caruso's conclusion there was that "[t]he failure by GM to understand the risks of certain dictated calibration values [in the SDM software calibration] led directly to the design defect that rendered the frontal impact airbag system in the 2005 Chevrolet Trailblazer defective and unreasonably dangerous in certain field relevant, real-world crashes." *Id.*

87.     GM LLC, a named defendant in that case, clearly knew about and received Mr. Caruso's report outlining the history of these issues in the SDM software calibration.

88.     Another plaintiff, Chad Vaith, filed a lawsuit against GM LLC in 2017 after an accident in his MY 2014 Silverado. As that complaint relates, in December 2015, Mr. Vaith was involved in an accident in which he drove his Silverado "off

the road into a ditch," after which he "continued through the ditch for approximately forty yards before launching over the driveway/culvert. . . before coming to a final rest approximately twenty yards south." *See Vaith v. General Motors LLC*, Dkt. 1, Case No. 18-cv-00031 (D. Minn.). Despite multiple impacts in that prolonged accident, the airbags and seatbelts did not deploy, causing Mr. Vaith to "suffer severe personal injuries." Mr. Caruso was also a disclosed expert in that case, although a report was not publicly filed. *See, e.g.*, *id.* at Dkt. 64.

89.    Mr. Vaith's case proceeded into fact discovery and ultimately resulted in a "negotiated settlement" between Mr. Vaith and GM. *Id.* at Dkt. 82.

90.    Apart from previous lawsuits against GM with Mr. Caruso as an expert, another automotive crash expert, Sal Fariello, wrote directly to GM's CEO Mary Barra twice in December 2016 to raise similar concerns about issues he had observed in the airbag sensing system in model year 2006 GM SUVs. Mr. Fariello's letters are available in NHTSA's public records.[39]

91.    Mr. Fariello's letters to GM's CEO focused on an accident in a 2006 Trailblazer (a Class Vehicle here) for which he served as a litigation consultant in a lawsuit filed in or around 2014. Therein, he lists multiple technical issues with the

---

[39] Mr. Fariello is a forensic crash investigator. *See* Exhibit N. Bill Saporito, "Air Bag Blow Out," *Time Magazine,* (December 4, 2014). Available at: https://time.com/3617681/the-air-bag-blowout (last visited August 4, 2021).

airbag sensing system that he wanted to bring to GM's attention and urge them to address. For example, he cautions that, in his view:

     a.    "The deployment thresholds [i.e. the inputs that will trigger deployment] for the airbag were set too high and compromised driver and passenger safety as a result of GM's improper effort to mitigate lawsuits related to relatively low speed deployments of the airbag.";

     b.    "The deployment threshold did not meet GM's and generally accepted standards for when an airbag should deploy in order to prevent occupant death based on written technical papers and educational videos produced by GM or its employees."; and

     c.    "Failure of the SDM to independently process a crash pulse and deploy the airbag implicates a defective software algorithm; specifically 'Algo S-H' [the software algorithm in the Class Vehicles]."

92.    At the time, in 2016, Mr. Fariello noted that the SDM could be re-programed "with a more responsive algorithm" to resolve these issues, and that GM's "only apparent motive for not doing this related to the cost of implementing a recall."

93.    Frustrated by the response he received from GM's counsel in response to these letters, Mr. Fariello then wrote to Senator Bill Nelson of Florida enclosing

his correspondence to GM and escalating his concerns. Senator Nelson then

forwarded that correspondence to NHTSA.[40]

94.     As Mr. Fariello concluded, in his view, GM was stalling on this issue

"just as they did with the Takata airbag matter."

**b.     GM knew or should have known about hundreds of publicly reported airbag failures in the Class Vehicles.**

95.     GM was also on notice of the SDM Calibration Defect and its attendant

safety risks from consumer complaints. These complaints are publicly available

online through NHTSA's website. Between 1999 and the present, hundreds of

consumers reported to NHTSA that airbags and/or seatbelts had suspiciously failed

during frontal crashes involving concatenated (multiple) impacts or potentially

prolonged crash onsets.

96.     On information and belief, vehicle manufacturers such as GM monitor

these public databases for complaints about their vehicles, in particular in light of

their statutory obligations to report known safety defects in their vehicles to NHTSA

and consumers. Moreover, in many of these reports, it is expressly clear that GM

was directly informed of, and even investigated, the accident in question. While GM

has access to the full body of these complaints from 1999 and onward in the public

---

[40] *See* Exhibit O. Mr. Fariello's letters to GM and further documentation are
available at: https://static.nhtsa.gov/odi/cmpl/2017/CL-10955948-3381.pdf (last
visited August 4, 2021).

-37-

database, it bears mention that over **three hundred** of them were filed *after* the new GM entities were created in 2009.[41]

97.     One such complaint details an accident in a 2004 Chevrolet Trailblazer in August 2014. The driver states that they were traveling 50 MPH on a four-lane highway where another vehicle, waiting to U-turn, "decided to turn right into me— oncoming traffic." The vehicles crashed, which then "sent [the driver] into a head on collision with the guard rail." The driver questions that "there were 2 incidents in that sequence of events that the airbags should have deployed, but did not! This accident caused several injuries to myself and my passenger. We definitely could have been killed and no airbags to help save our lives…" Photos of the damage to the vehicle from that accident follow. (NHTSA Complaint #1100694).

---

[41] Many publicly reported accidents occurred prior to 2009, which information would likewise have been available to Old GM. GM would have acquired Old GM's knowledge of these accidents, reflected in its books, records, and personnel, when it was formed in 2009.



000-13679321   08/25/2014 COPYRIGHT 2014 - INSURANCE AUTO AUCTIONS



000-13679321   08/25/2014 COPYRIGHT 2014 - INSURANCE AUTO AUCTIONS

98.     Another report describes a September 2012 accident in a 2005 Chevrolet Trailblazer. It states that the driver, at 30 MPH, swerved to avoid a deer in the road, which caused the vehicle to lose control, exit the road, and ultimately "crash[] off a 9 foot embankment." From there, the vehicle continued to crash through a field, into a dirt levy, and finally into a drainage ditch. None of the airbags deployed. The driver "became unconscious after his head crashed into the steering wheel" and "suffered severe neck injuries." The dealer later inspected the vehicle, but responded that the results were "inconclusive" and that the manufacturer "was notified but offered no assistance." Photos of the damage to the vehicle from that accident follow. (NHTSA Complaint #942950).[42]

---

[42] *See* Exhibit P. Accident documentation and photos are available at: https://static.nhtsa.gov/odi/cmpl/2012/EQ-10477257-8767.pdf (last visited August 4, 2021).





99.    In another example, the complaint describes a serious accident in March 2019 involving a 2005 Chevrolet Equinox. The vehicle crashed into the front of another vehicle at 35 MPH. The airbags did not deploy. The driver sustained injuries to the head and ankle and required medical attention. Photos of the damage to the vehicle from that accident follow. (NHTSA Complaint #1550406).[43]



---

[43] *See* Exhibit Q. Photos and accident information are available at: https://static.nhtsa.gov/odi/cmpl/2019/EQ-11191960-7090.pdf (last visited August 4, 2021).



    100.   Another account of a July 2007 accident in a model year 2001 Isuzu Rodeo describes a crash at 65 MPH so severe that "the median on the highway sustained property damage" and "the vehicle was destroyed," but the airbags did not deploy. This is how the vehicle looked after that accident:



101.   Additional examples of similarly suspicious frontal accidents—i.e.,

frontal accidents with multiple discrete impacts, or potentially prolonged onset

frontal crashes involving "soft" impacts—in which the airbags and/or seatbelts failed

include:

a.   NHTSA complaint #753287 dated Tuesday, October 16, 2001,

reported an accident on Monday, October 8, 2001 involving a 1999 CHEVROLET

SUBURBAN in Andover, KS. The complaint states: "60 MPH CROSS WIND

BLEW THE SUBURBAN HEAD ON INTO THE CONCRETE MEDIAN. THE

VEHICLE SPUN 360 DEGREES, WENT INTO THE DITCH, THE FRONT END

HIT AGAIN THE VEHICLE WENT UP THE OTHER SIDE OF THE

EMBANKMENT AND STOPPED IN A FIELD. ENTIRE FRONT END OF THE FRAME NOT REPAIRABLE . . . FRONT CROSSMEMBER BENT AND ENGINE MOVED UPWARDS AT A 10 DEGREE ANGLE. **AIR BAGS FAILED TO DEPLOY**. \*AK"[44]

     b.    NHTSA complaint #859858 dated Friday, April 7, 2000, reported an accident on Saturday, April 3, 1999 involving a 1999 CHEVROLET SILVERADO. The complaint states: "WHILE TRAVELING ON A WET ROAD AT HIGHWAY SPEED OF 60 MPH VEHICLE HYDROPLANED, SPUN INTO A DITCH, AND COLLIDED INTO A TREE WITH BOTH SIDES AND FRONT OF VEHICLE. UPON IMPACT, **AIR BAGS FAILED TO DEPLOY**. MFR. NOTIFIED. \*AK"

     c.    NHTSA complaint #877320 dated Wednesday, January 3, 2001, reported an accident on Friday, December 1, 2000 involving a 1999 CHEVROLET SUBURBAN in Amarillo, TX. The complaint states: "CONSUMER WAS TRAVELING ABOUT 40MPH ON HIGHWAY AND ANOTHER VEHICLE VEERED INTO HER LANE, HITTING HER HEAD-ON, AND PUSHING VEHICLE INTO ANOTHER LANE. VEHICLE HIT TELEPHONE POLE, AND **DUAL AIRBAGS DIDN'T DEPLOY**. CONSUMER WAS INJURED. CHEVROLET HAS BEEN NOTIFIED. \*AK"

---

[44] Emphasis is supplied here and in the paragraphs that follow.

d.      NHTSA complaint #10060150 dated Tuesday, March 2, 2004,

reported an accident on Tuesday, February 24, 2004 involving a 2001

CHEVROLET BLAZER in Austin, TX. The complaint states: "**DRIVER SIDE**

**AIR BAG FAILED TO DEPLOY** IN A CRASH THROUGH: 1. A SIX FOOT

TALL WOODEN FENCE AT ALMOST 30MPH, THEN 2. THE EXTERIOR SIDE

OF A 2-STORY HOME THAT CONTAINED THE KITCHEN SINK AND

PLUMBING FIXTURES, WHILE SMASHING UP AND OVER THE FIFTEEN-

INCH CONCRETE FOUNDATION, FRONT-END FIRST.*AK"

e.      NHTSA complaint #10082050 dated Thursday, July 15, 2004,

reported an accident on Wednesday, July 14, 2004 involving a 2003 CHEVROLET

SUBURBAN in Fresno, CA. The complaint states: "THE CONSUMER WAS

INVOLVED IN AN ACCIDENT WHERE IT WAS HIT FROM THE FRONT

DRIVER SIDE, THE IMPACT CAUSED THE VEHICLE TO HIT A

TELEPHONE POLE HEAD ON. **THE AIR BAGS DID NOT DEPLOY**. *JB"

f.      NHTSA complaint #10103512 dated Friday, December 10, 2004,

reported an accident on Sunday, December 5, 2004 involving a 2001 CHEVROLET

SILVERADO in Rialto, CA. The complaint states: "CONSUMER'S VEHICLE

WAS REAR ENDED WHILE DRIVING 50 MPH. THE VEHICLE WAS

FORCE[D] INTO A SPIN AND THEN, IT HIT A CONCRETE ROAD DIVIDER.

UPON IMPACT, **NEITHER FRONTAL AIR BAGS DEPLOYED**. DRIVER

-46-

SUSTAINED INJURIES, AND HAD TO BE TRANSPORTED TO A LOCAL

HOSPITAL. DEALER AND MANUFACTURER WERE NOTIFIED. THE

CONSUMER STATED THAT **THE SEAT BELT DID NOT KEEP HER FROM**

**HITTING HER CHEST ON THE STEERING WHEEL**."

       g.     NHTSA complaint #10108404 dated Tuesday, February 1, 2005,

reported an accident on Tuesday, January 11, 2005 involving a 2000 CHEVROLET

SILVERADO in Toney, AL. The complaint states: "A CAR PULLED OUT IN

FRONT OF ME WHICH STILL HIT THE DRIVER'S SIDE OF MY VEHICLE

(2000 CHEVY SILVERADO). THEN MY TRUCK HAD A FULL FRONTAL

IMPACT AT GREATER THAN 30 MPH INTO A DIRT WALL IN WHICH

**NEITHER THE DRIVER'S NOR PASSENGER'S AIRBAGS DEPLOYED**

(THE TRUCK IS TOTALLED). **I HIT THE STEERING WHEEL** AND GOT A

CONCUSSION WITH BLOOD AROUND THE BRAIN, A BROKE CHEEK

BONE, AND FRACTURED HIP. MY WIFE WAS 33 WEEKS PREGNANT AT

THE TIME AND HER WATER BROKE AND SHE GOT A COMPOUND

FRACTURE IN THE LOWER LEG/ANKLE. AS A RESULT OF THE WATER

BREAKING MY SON WAS BORN 3 DAYS LATER 7 WEEKS PREMATURE.

AS FOR WHAT WAS DONE TO CORRECT THE PROBLEM I'M HOPING IT

WILL AT LEAST BE INVESTIGATED TO MAKE SURE THIS IS NOT A

SYSTEMIC PROBLEM (I.E. SOFTWARE SCREWUP SOMETHING NOT HOOKED UP RIGHT IN THE AIRBAG SYSTEM ETC)."

h.     NHTSA complaint #10115806 dated Thursday, March 24, 2005, reported an accident on Thursday, March 24, 2005 involving a 2002 CHEVROLET SILVERADO in Claremore, OK. The complaint states: "A PIECE OF FURNITURE WAS LOCATED IN THE MIDDLE OF THE HIGHWAY WHILE DRIVING, CAUSING THE DRIVER TO HIT THE FURNITURE. DRIVER LOST CONTROL OF A VEHICLE, AND IT CRASHED INTO A CONCRETE WALL. **DRIVER'S SIDE SEAT BELT FAILED, AND THE AIRBAGS DID NOT DEPLOY**."

i.     NHTSA complaint #10158090 dated Tuesday, May 23, 2006, reported an accident on Sunday, February 26, 2006 involving a 2004 CHEVROLET TRAILBLAZER in Fayetteville, NC. The complaint states: "DT*: THE CONTACT STATED WHILE DRIVING 50 MPH THE VEHICLE WAS INVOLVED IN A HEAD ON COLLISION WITH ANOTHER VEHICLE. THE VEHICLE CONTINUED MOVING AND STOPPED BY COLLIDING WITH A STORE SIGN. **THE AIR BAGS DID NOT DEPLOY AND SEAT BELTS WERE WORN** . . . THE INSURANCE COMPANY DETERMINED THE VEHICLE WAS TOTALED DUE TO THE ACCIDENT. THE DEALER DOES NOT HAVE

-48-

THE MEANS TO TEST FOR AIR BAG NON-DEPLOYMENT. UPDATED 1/24/2007 - *NM"

j.      NHTSA complaint #10161658 dated Thursday, July 6, 2006, reported an accident on Saturday, June 3, 2006 involving a 1999 CHEVROLET BLAZER in Ludlow, MA. The complaint states in part: "CHEVY DRIVER HIT A CAR IN HER LANE FIRST, THEN RICOCHETED HEAD ON INTO A TREE. **NEITHER TIME DID AIRBAGS DEPLOY**. *TT"

k.      NHTSA complaint #10163811 dated Friday, July 28, 2006, reported an accident on Thursday, July 20, 2006 involving a 2000 ISUZU RODEO in Nederland, TX. The complaint states: "A GIRL RAN A RED LIGHT AND I HIT HER IN THE PASSENGER SIDE OF HER CAR HEAD ON WITH MY 2000 ISUZU RODEO. IT WAS A FULL FRONTAL COLLISION FOR ME AND MY CHILDREN. LUCKILY, WE ARE ALWAYS BUCKLED UP BECAUSE **NONE OF MY AIRBAGS DEPLOYED AT ALL**. THE OTHER CAR WAS GOING ABOUT 60 MPH AND HER AIRBAG DEPLOYED WHEN I HIT HER BUT MINE DID NOT. LUCKILY, MY CHILDREN WERE NOT HURT BADLY BUT UNFORTUNATELY, I SUSTAINED NECK, BACK AND KNEE INJURIES. I WAS AND STILL AM VERY UPSET THAT **MY AIRBAGS FAILED. EVEN THE OWNER OF THE BODY SHOP I USE WAS IN SHOCK THAT THEY DID NOT DEPLOY AS THE IMPACT WAS ENOUGH TO SPLIT THE**

-49-

**FRAME OF MY RODEO AND TOTAL IT OUT** . . . THANK YOU FOR YOUR TIME, I HOPE I CAN HELP ANOTHER FAMILY FROM GETTING INJURED."

l. NHTSA complaint #10217793 dated Tuesday, February 12, 2008, reported an accident on Thursday, February 7, 2008 involving a 2006 CHEVROLET TRAILBLAZER in Lakewood, OH. The complaint states: "A 2006 CHEVY TRAILBLAZER TRAVELING OVER THE SPEED LIMIT ON MY STREET CRASHED INTO A TREE, A PARKED CAR, AND THEN CONTINUED TO ROLL OVER ACROSS MY FRONT LAWN, LANDING SIDEWAYS AFTER FLIPPING SEVERAL TIMES. THE OCCUPANTS WERE SEVERELY INJURED. **NO AIRBAGS DEPLOYED DURING THE CRASH**. THE DRIVER OF THE VEHICLE IS IN ICU NEEDING FACIAL RECONSTRUCTIVE SURGERY. *TR"

m. NHTSA complaint #10221319 dated Saturday, March 15, 2008, reported an accident on Thursday, February 21, 2008 involving a 2005 CHEVROLET TRAILBLAZER in Clay, NY. The complaint states: "I WAS DRIVING ON A 2 LANE ROAD GOING 45MPH. A CAR WAS FOLLOWING CLOSE BEHIND ME SO I WENT TO GET INTO RIGHT LANE AND MY TRUCK DID 5 360 AND HIT 3 TREES HEAD ON AND **AIR BAG NEVER DEPLOYED**. *TR"

-50-

n.    NHTSA complaint #10263896 dated Wednesday, April 1, 2009, reported an accident on Thursday, March 26, 2009 involving a 2002 CHEVROLET TRAILBLAZER in Elizabeth, NJ. The complaint states: "I WAS IN A CAR ACCIDENT, WHERE I WAS TRAVELING AT ABOUT 35 MPH. AN AGGRESSIVE DRIVER SPEED AROUND ME AND CUT ME OFF AND THAN STOMPED ON THIS BRAKES IN FRONT OF ME. DUE TO THAT I SWERVED TO MISS HIM CLIPPING HIS RIGHT BACK LIGHT AD BUMPER WITH MY LEFT HEADLIGHT AND BUMPER. AS I WAS SWERVING I HIT A TREE JUST ABOUT DEAD ON WITH MY CAR . . . I HIT THE TREE AT A SPEED OF ABOUT 28-30 MPH. AFTER INITIAL IMPACT I WAS RUSHED TO THE HOSPITAL DUE TO UNCONSCIOUS AND FACIAL CONTUSIONS. DURING THE FIRST MOMENTS AFTER THE ACCIDENT, ONE OF THE FIRST THINGS OFFICERS, EMTS AND WITNESSES SAID WAS "**I CAN'T BELIEVE THE AIRBAGS DIDN'T GO OFF.**" IN THE RECENT DAYS AFTER THE ACCIDENT I HAVE HAD SEVERAL MECHANICS AND SUCH APPRAISE THE CAR, THE ONE COMMON THEME THEY ALL SHARE IS THAT THEY SUSPECT THERE MIGHT NOT BE AN AIRBAG WHERE IT BELONGS. OR THE LACK THERE OF. *TR"

o.    NHTSA complaint #10463248 dated Wednesday, June 27, 2012, reported an accident on Friday, July 15, 2011 involving a 2005 GMC in Richmond,

-51-

VA. The complaint states: "THE CONTACT STATED WHILE DRIVING 55 MPH, HE CRASHED INTO A TREE. **THE AIR BAGS FAILED TO DEPLOY** . . . A POLICE REPORT WAS FILED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE; HOWEVER, THEY PROVIDED NO ASSISTANCE . . . THE CONSUMER'S VEHICLE WAS DAMAGED WHEN HE TRIED TO AVOID HITTING THE VEHICLE BY SWERVING SIDEWAYS AND SLIDING INTO THE GRASS. HE TRIED STOPPING THE VEHICLE WHILE IT WAS STILL ON THE PAVEMENT BUT HE INEVITABLY RAN INTO THE DITCH AND FLEW AIRBORNE INTO A TREE, AND THE TRUCK OVERTURNED."

      p.     NHTSA complaint #10524151 dated Wednesday, July 10, 2013, reported an accident on Thursday, May 30, 2013 involving a 2006 CHEVROLET TRAILBLAZER in Mansfield, OH. The complaint states: "THIS COMPLAINT IS BEING FILED ON BEHALF OF THE VEHICLE OWNER AND DRIVER. THIS CHEVY TRAILBLAZER WAS INVOLVED IN A TWO VEHICLE, DOUBLE FATAL CRASH. THE FRONT OF THE TRAILBLAZER STRUCK THE DRIVER'S SIDE DOOR OF A CAVALIER THAT FAILED TO YIELD FROM A STOP SIGN. THE TRAILBLAZER STAYED CONNECTED WITH THE CAVALIER, FORCING IT OFF THE LEFT SIDE OF THE ROADWAY AND INTO A LARGE TREE. BOTH OCCUPANTS IN THE CAVALIER WERE FATALLY INJURED. THE FRONT **AIRBAGS DID NOT DEPLOY ON THE**

**TRAILBLAZER** AND NO EVENT WAS RECORDED ON THE AIRBAG

CONTROL MODULE. *TR"

       q.     NHTSA complaint #10537593 dated Tuesday, August 27, 2013,

reported an accident on Tuesday, August 13, 2013 involving a 2003 CHEVROLET

BLAZER in Harrison Township, MI. The complaint states: "I WAS TRAVELING

SOUTHBOUND WHEN I EXPERIENCED A SEIZURE AND LOST CONTROL

OF MY VEHICLE. I PROCEEDED TO VEER TO THE LEFT WHERE I

CLIPPED SEVERAL CARS THAT WERE HEADED NORTHBOUND . . . I

THEN PROCEEDED OVER A TREE LAWN AND INTO A PARKING LOT. I

HIT A DODGE RAM PICKUP WITH THE RIGHT FRONT CORNER OF MY

VEHICLE AND PUSHED THAT VEHICLE INTO ANOTHER PARKED CAR

THAT WAS NEXT TO IT. BOTH VEHICLES ENDED UP SIDEWAYS AND MY

VEHICLE ENDED UP SPUN AROUND 180 DEGREES . . . THE JAWS OF LIFE

WERE USED TO EXTRACT ME FROM MY VEHICLE. I WAS TAKEN TO A

LOCAL HOSPITAL WHERE IT WAS DETERMINED THAT I SUFFERED

BURST FRACTURES OF L1, L2, AND L3. I ALSO SUFFERED AN EVULSION

FRACTURE OF MY LEFT ANKLE. THE POLICE REPORT STATES THAT I

WAS TRAVELLING AT A HIGH RATE OF SPEED AND THAT THE

VEHICLES WHICH WERE NORTHBOUND WERE JUST CLIPPED. **THE**

**AIRBAGS ARE BOTH STILL WITHIN THEIR CASES AS NEITHER**

**DEPLOYED** . . . **THE INSURANCE INVESTIGATOR EVEN EXPRESSED TO MY WIFE THAT HE WAS SURPRISED THAT THE AIR BAG DID NOT DEPLOY**."

r.      NHTSA complaint #10550276 dated Wednesday, October 30, 2013, reported an accident on Monday, October 28, 2013 involving a 2006 CHEVROLET TRAILBLAZER in Neihart, MT. The complaint states: "TL* THE CONTACT OWNS A 2006 CHEVROLET TRAILBLAZER. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 35 MPH, SHE LOST CONTROL OF THE VEHICLE WHILE DRIVING IN SNOWY WEATHER. THE VEHICLE NOSE DIVED INTO AN EMBANKMENT AND THEN CRASHED INTO A BOULDER. **THE AIR BAGS FAILED TO DEPLOY**. THE CONTACT WAS TRANSPORTED TO THE HOSPITAL VIA AMBULANCE FOR TREATMENT OF A CONCUSSION AND BRUISING. THE FRONT PASSENGER WAS ALSO INJURED AND SUSTAINED BRUISING. THE VEHICLE WAS DESTROYED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE."

s.      NHTSA complaint #10574295 dated Sunday, March 23, 2014, reported an accident on Friday, February 21, 2014 involving a 2010 GMC TERRAIN in Saint Joe, IN. The complaint states: "INVOLVED IN A 21 CAR PILE UP IN THE UPPER PENINSULA DURING A COMPLETE WHITE OUT. WE

WERE ONLY TRAVELING APPROXIMATELY 25 MILES PER HOUR BUT,
WE DID HAVE SERIOUS IMPACT IN THE FRONT, AFTER HITTING A
TRAILER AND ALSO SERIOUS IMPACT FROM BEHIND WHEN HIT BY A
TRUCK AND TRAILER. **NO AIRBAGS DEPLOYED**. THE TRUCK
TRAVELING AHEAD OF US, THAT WE HIT, THE AIRBAGS DID DEPLOY.
**MY FATHER AND BROTHER, WHO WERE ALSO BOTH DRIVING
CHEVY TRUCKS, AND ALSO HAD SERIOUS FRONT END DAMAGE
DURING THE SAME ACCIDENT, THEIR AIRBAGS DID NOT DEPLOY
EITHER**. *TR"

      t.     NHTSA complaint #10576031 dated Monday, March 31, 2014,
reported an accident on Sunday, March 23, 2014 involving a 2012 CADILLAC SRX
in Kaplan, LA. The complaint states: "I FELL ASLEEP WHILE DRIVING,
JUMPED A LEVEE, RAN THROUGH A FENCE, AND WRECKED IN A
GRASSY WATERY AREA. MY ENGINE WAS SMASHED, THE MOTOR
MOUNT BROKE, AND MY TIRES ARE PUSHED BACK. **MY AIR BAGS DID
NOT DEPLOY. MY FACE HIT THE STEERING WHEEL AND MY NOSE
IS BROKEN**. I WOULD LIKE TO FIND OUT IF THERE IS ANY RECALLS ON
THIS CAR. *TR"

      u.     NHTSA complaint #10583703 dated Saturday, April 19, 2014,
reported an accident on Thursday, March 13, 2014 involving a 2012 GMC

TERRAIN in Moneta, VA. The complaint states: "I INADVERTENTLY VEERED OFF SIDE ROADWAY, (VA HIGHWAY 220) COLLIDING WITH A TREE/ROADSIDE SHRUBS, ETC (**WAS KNOCKED UNCONSCIOUS AS FOREHEAD HIT STEERING WHEEL ON INITIAL IMPACT). AIRBAGS DID NOT DEPLOY** ALLOWING ME TO SUSTAIN A HEAD INJURY THAT KNOCKED ME UNCONSCIOUS... FOREHEAD WAS GASHED WITH SIGNIFICANT BLEEDING. I WAS TRANSPORTED BY AMBULANCE IN UNCONSCIOUS STATE. DAMAGE TO VEHICLE IS IN EXCESS OF $8,000 SO FAR AS VEHICLE STILL IN REPAIR SHOP WITH MASSIVE FRONT END DAMAGE THAT AFFECTS STEERING LINKAGE, ETC. THE IMPACT OF VEHICLE AGAINST FOLIAGE, TREES SHRUBS, SHOULD HAVE FORCED AIR BAGS TO DEPLOY AND I BELIEVE THAT I WOULD NOT HAVE SUSTAINED A HEAD INJURY THAT RENDERED ME UNCONSCIOUS WITH MILD CONCUSSION AND COULD NOT CONTROL VEHICLE LEAVING ROADWAY. *TR"

  v.  NHTSA complaint #10592423 dated Monday, May 19, 2014, reported an accident on Thursday, May 8, 2014 involving a 2003 CHEVROLET SILVERADO in Burtonsville, MD. The complaint states: "TRUCK COLIDED WITH GUARD RAIL. BOUNCED OFF, HIT VEHICLE 1, THEN INTO VEHICLE 2 THEN STOPPED AFTER HITTING VEHICLE 3 A SEMI TRUCK.

ALL DAMAGE WAS DONE TO FRONT OF THE CHEVY SILVERADO. **AT NO TIME DID THE AIRBAGS DEPLOY**.”

      w.    NHTSA complaint #10622016 dated Wednesday, August 13, 2014, reported an accident on Saturday, August 9, 2014 involving a 2012 CHEVROLET TAHOE in The Colony, TX. The complaint states: “WHILE TURNING LEFT (TAHOE) WITH A PROTECTED GREEN ARROW AT AN X-SHAPED INTERSECTION, VEHICLE (KIA SEDAN) AT FAULT FAILED TO YIELD AND ENTERED THE INTERSECTION AT SPEEDS UPWARDS OF 40 MPH FROM THE LEFT OF THE TAHOE. FRONT-IMPACT COLLISION OCCURRED . . . TAHOE STRUCK PASSENGER SIDE OF KIA SEDAN. TRAJECTORY OF IMPACT CAUSED DIRECTIONAL CHANGES IN UPWARDS OF 90* FOR BOTH VEHICLES; THE FORCE OF THE PRIMARY ACCIDENT DESCRIBED ABOVE ALSO CAUSED MENTIONED VEHICLES TO COLLIDE WITH LEFT REAR OF ANOTHER VEHICLE (HONDA SEDAN) . . . **DUE TO THE FORCE OF IMPACT, FRONT & SIDE AIRBAGS DEPLOYED ON BOTH THE KIA SEDAN AND THE HONDA SEDAN, BUT FAILED TO DEPLOY ON THE TAHOE** . . . FORCE WAS SUCH THAT AFTER THE COLLISION, TAHOE TRANSMISSION WAS IN DRIVE, BUT REMAINED AT A COMPLETE STOP. DAMAGE SUSTAINED ON THE TAHOE INCLUDE FRONT-END BODY DAMAGE, ENGINE DAMAGE

(VEHICLE REQUIRED TOWING AND WAS INOPERABLE), AND FRAME DAMAGE, AT A MINIMUM . . . **MULTIPLE FIRST-RESPONDERS COMMENTED ON THE ODDITY THAT, GIVEN THE DAMAGE SUSTAINED BY THE TAHOE AND THE VELOCITY AT IMPACT, THE AIRBAGS DEPLOYED ON ALL VEHICLES BUT THE TAHOE**. *TR"

      x.     NHTSA complaint #10641399 dated Saturday, October 4, 2014, reported an accident on Tuesday, June 7, 2011 involving a 2002 CHEVROLET TAHOE in Cheney, WA. The complaint states: "THE CONTACT STATED THAT WHILE THE DRIVER WAS DRIVING AT 45 MPH AND ATTEMPTED TO AVOID A CRASH WITH ANOTHER VEHICLE. AS A RESULT, THE DRIVER CRASHED INTO A GUARDRAIL **AND THE AIR BAGS FAILED TO DEPLOY**. A POLICE REPORT WAS FILED. THE CONTACT WAS TAKEN TO A HOSPITAL AND SUSTAINED INJURIES TO THE RIBS, THE COLLAR BONES, A BRAIN TRAUMA AND A COLLAPSED LUNG. THE DRIVER SUFFERED FROM FATAL INJURIES."

      y.     NHTSA complaint #10767586 dated Tuesday, September 22, 2015, reported an accident on Saturday, August 1, 2015 involving a 2004 CHEVROLET TRAILBLAZER in Tallahassee, FL. The complaint states: "MY MOTHER WAS INVOLVED IN A 1 CAR ACCIDENT ON BAUM RD LOCATED IN TALLAHASSEE, FL. SHE WAS THE ONLY PASSENGER

DETERMINED TO BE IN THE VEHICLE AT THE TIME OF THE ACCIDENT.
ACCORDING TO THE CRASH REPORT, D1 (DRIVER ONE) WAS
TRAVELING WESTBOUND ON BAUM RD GOING THE NORMAL POSTED
SPEED OF 55MPH, WHEN SHE VEERED TOWARDS THE CENTER OF THE
RD AND SUDDENLY TURNED RIGHT VEERING OF THE RIGHT
SHOULDER OF THE RD AND STRIKING SEVERAL TREES ON THE
DRIVERS SIDE AND FRONT END . . . WHEN I WENT TO RETRIEVE MY
MOTHERS THINGS FROM HER TRAILBLAZER, I NOTICED THAT **NO AIR
BAGS HAD DEPLOYED**. AND AS FAST AS MY MOM WAS GOING AND
THE TYPE OF IMPACT & DAMAGE HER SUV SUSTAINED, I WOULD
THINK AND HOPE THE AIRBAGS WOULD DEPLOY IN THIS TYPE OF
ACCIDENT, THUS PREVENTING SERIOUS INJURY OR DEATH. MY MOM
WAS NOT SO LUCKY, AND MYSELF AND MY FAMILY HAVE ENDURED
GREAT PAIN FROM LOOSING HER SO SUDDENLY."

       z.     NHTSA complaint #10907149 dated Friday, September 16,
2016, reported an accident on Thursday, September 1, 2016 involving a 2006
CADILLAC SRX in Happy Valley, OR. The complaint states: "THE VEHICLE
HIT A CURB AND DROVE INTO A BUILDING. **THE AIR BAGS FAILED TO
DEPLOY**. THE CONTACT SUSTAINED INJURIES THAT REQUIRED

MEDICAL ATTENTION . . . THE MANUFACTURER WAS NOTIFIED OF THE FAILURE."

102.   GM knew or had reason to know about these complaints, which are publicly available on NHTSA's website. Indeed, many complaints explicitly state that GM was directly informed of and/or investigated these suspicious accidents. For example:

a.   A complaint about an August 2018 accident in a 2008 GMC Acadia details that the airbags and seatbelt pretensioners did not deploy after the complainant's wife fell asleep at the wheel and struck a utility pole and then a large dirt embankment—which caused her to "hit the steering column so hard . . . it broke the column and broke her sternum," and caused the granddaughter in the passenger seat to break her back in two places. It continues that "GENERAL MOTORS . . . SENT A MAN TO DOWNLOAD THE COMPUTER INFORMATION THEY SENT ME A COPY OF THE INFO AND LATER CONTACTED ME SAYING THE INFO SHOWED EVERYTHING WAS WORKING PROPERLY." NHTSA complaint #11066850.

b.   After a July 2014 head on collision at 50 MPH where the airbags did not deploy in a 2007 Silverado, totaling the vehicle, another driver was "TOLD BY GM THAT CRASH DID NOT MEET CRITERIA FOR DEPLOYMENT." The driver expressed skepticism about this response, and in the complaint, stated "A

-60-

HEAD ON COLLISION AT 50 MPH THAT TOTALED 2500 SERIES CHEVY

TRUCK. HARD FOR ME TO BELIEVE . . . DO I NEED TO [BE]

CONCERNED?" NHTSA complaint #10608220.

      c.     Another driver reported on a May 2014 accident in a 2012 GMC

Terrain in Moneta, VA. The driver struck "something" head on after veering off the

highway and proceeded through trees and brush. They were knocked unconscious

after hitting their head on the steering wheel upon the first impact, as the airbags had

failed to deploy. They were transported to a hospital by ambulance and spent two

days in inpatient care. The driver later "CONTACTED GMC CORPORATE . . . TO

ADVISE MY CONCERNS FOR SAFETY . . . RECEIVED A FOLLOW UP

TELEPHONE CALL FROM GMC REPRESENTATIVE . . . HE EXPRESSED NO

INTEREST IN MY COMPLAINT . . . REFUSED TO COMMENT ON MY

STATEMENT THAT AIR BAG FAILED TO DEPLOY RESULTING IN

EXTENSIVE DAMAGE TO FRONT OF VEHICLE AND SUSTAINING A HEAD

INJURY AS NO BAG DEPLOYED . . . I WAS ADVISED THAT GMC HAD NO

FURTHER INTEREST IN THIS MATTER AND WOULD NOT EVALUATE MY

SAFETY CONCERNS." NHTSA complaint #10588334.

      d.     After a July 2012 accident involving a 2012 GMC Terrain in San

Clemente, CA in which the Terrain was hit multiple times in an intersection in the

driver's front end, but no airbags deployed, resulting in whiplash and contusions to

the driver, a GM representative responded to a complaint lodged by the driver's parents and stated that there was "NO NEED FOR DEPLOYMENT" because it was a "LOW THRESHOLD EVENT." NHTSA complaint #10466384.

      e.    After hitting a patch of black ice at 58 MPH in a Chevrolet Silverado in January 2008, another complainant described that they lost control of the vehicle, ran off the road, crashed into a telephone pole and ultimately into a frozen embankment. The airbags did not deploy, causing the driver to hit the steering wheel. As the complainant relates, they "FILED A COMPLAINT WITH THE MANUFACTURER, BUT THE COMPLAINT WAS DENIED. THE MANUFACTURER WAS UNABLE TO DIAGNOSE THE VEHICLE; HOWEVER, AFTER INSPECTION OF THE VEHICLE, THE MANUFACTURER CONFIRMED THAT THE AIR BAGS WERE ENABLED AT THE TIME OF IMPACT. THEY DID NOT GIVE AN EXPLANATION FOR THE DEPLOYMENT FAILURE." NHTSA complaint #10238395.

      f.    In a report about a March 2006 accident involving a 2005 Cadillac Escalade in Louisville, KY, the complainant describes that after none of the airbags deployed in a front end collision in their 4-week old vehicle, they "CALLED CADILLAC CUSTOMER SERVICE AND WAS GIVEN AN AIRBAG HISTORY LESSON VIA TELEPHONE FROM SOMEONE THAT HAD NEVER SEEN MY VEHICLE OR INSPECTED IT FOR DAMAGE AFTER THE ACCIDENT. AT

THE END OF OUR CONVERSATION I WAS TOLD ALL WAS OK, NONE OF MY AIRBAGS SHOULD HAVE DEPLOYED AND NOT TO WORRY ABOUT IT. THE ENTIRE FRONT END OF MY VEHICLE WAS KNOCKED OFF, THE FRAME HAS MULTIPLE CRACKS AND IS BENT AS A RESULT OF THE COLLISION AND THE COLLISION CENTER IS 90% CERTAIN THE VEHICLE IS NOT REPAIRABLE. *JB" NHTSA complaint #10152376.

g.      After an August 2004 accident involving a 1999 Chevrolet Astro in Norfolk, Virginia in which the vehicle jumped a curb, struck and fire hydrant, and then struck a tree without the airbags deploying, the driver was taken by ambulance to the hospital for head and neck injuries. After the accident, the "CONSUMER CONTACTED THE MANUFACTURER AND A REPRESENTATIVE CAME DOWN TO MEET WITH THE DEALER AND CONSUMER. THE REPRESENTATIVE INFORMED CONSUMER THAT THE VEHICLE WAS FUNCTIONING AS DESIGNED." NHTSA complaint # 10087718.

h.      Another driver contacted GM after the airbags did not deploy in a February 2004 front end collision at 25-30 MPH in their 2000 Isuzu Rodeo in Westwood, NJ. "THE CONSUMER CONTACTED THE MANUFACTURER ABOUT THE AIR BAGS BUT THE REPRESENTATIVE DID NOT SEEM TO BE TOO CONCERNED ABOUT THE SITUATION." NHTSA complaint #10087550.

i.    Another driver described a head on collision at 39 MPH in their

2002 Chevrolet Tahoe in which the airbags did not deploy and the seatbelts did not

tighten. The driver hit their head on the steering wheel, knocking them unconscious.

A readout from the vehicle's computer showed the seatbelts were in working order,

and GM responded by sending a representative to inspect the vehicle in person. The

complainant was awaiting a response from GM at the time of the report. NHTSA

complaint #10353935.

103.   More than ***eight hundred*** similar complaints—i.e. frontal crashes in the

Class Vehicles with airbag and seatbelt failures following multiple impacts, or,

potentially long-soft frontal impacts—are attached hereto as Exhibit A.[45]

104.   In addition to these consumer complaints, a separate, public dataset

from NHTSA, the Fatality Analysis Reporting System ("FARS") provides a

nationwide census of crashes that resulted in fatal injuries.  While the complaints

outlined above are reported to NHTSA by consumers and can include any type of

complaint or incident, FARS data is reported by state agencies responsible for

monitoring all qualifying fatal crashes in their states. To be included in FARS data, a

crash must involve a motor vehicle traveling on a public road and result in the death

of a person in one or more of the vehicles involved in the crash within 30 days of the

---

[45] The accidents in the preceding paragraph and Exhibit A include data for Class
Vehicles in model years 1999-2014.

crash. The dataset collects information on over 100 different data elements that characterize the crash, the vehicles, and the people involved—including whether or not the airbags deployed.

105.   NHTSA's FARS dataset also reveals a recurring pattern of suspicious nondeployments during frontal crashes (i.e., the crash dynamics that can implicate the SDM Calibration Defect) and reinforces the extremely high stakes of such incidents. From 1999 to present, FARS data reflects at least ***1,946*** frontal crashes where the airbags did not deploy in a Class Vehicle—1,167 of which occurred in 2009 or later, after New GM was formed. This same data reflects that at least 1,298 individual occupants (drivers or passengers) in a Class Vehicle were injured or killed in these crashes.

### D.   Despite its knowledge, GM misrepresented and concealed important information about the SDM Calibration Defect and Class Vehicle safety.

106.   For many consumers, including Plaintiffs, safety is one of the most important factors when buying or leasing a vehicle. GM capitalized on this fact in advertising and other consumer-facing representations about the Class Vehicles and touted the safety of the Class Vehicles in national marketing campaigns.

107.   In advertisements and promotional materials, GM maintained that the Class Vehicles were safe and reliable, and it did not correct representations about the Class Vehicles' safety and reliability made by Old GM in the past. Instead, GM has

repeatedly touted the Class Vehicles' passenger safety systems and assured consumers they could be relied upon to activate the airbags and seatbelts during a crash. These representations are false and misleading because of what they fail to say; GM uniformly failed to disclose that the SDM Calibration Defect could—at the worst possible moment—prevent the airbags and seatbelts from activating.

108.   Plaintiffs, directly or indirectly, were exposed to these advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. If GM had instead chosen to disclose the truth about the SDM Calibration Defect— including at dealerships, on its website, in brochures, press releases or in other promotional materials—Plaintiffs and Class members would have seen those disclosures. The misleading statements about Class Vehicles' safety in GM's advertisements and promotional materials, as well as GM's omission of the truth about the SDM Calibration Defect, influenced Plaintiffs and Class members' decisions to purchase or lease Class Vehicles.

**1.**      **Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the SDM Calibration Defect.**

109.   To sell its vehicles in the United States, GM was required to "certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed" by NHTSA under Chapter 301 of Title 49 of the U.S. Code. GM "may not issue the certificate if, in exercising

reasonable care," they have "reason to know the certificate is false or misleading in a material respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112.

110.   Because "[c]ertification of a vehicle must be shown by a label permanently fixed to the vehicle," all Class Vehicles have a permanent label certifying compliance with the safety regulations prescribed by NHTSA. Since all the Class Vehicles are passenger vehicles, the permanent label must state: "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 C.F.R. § 567.4(g)(5).

111.   These labels were false and misleading because they failed to warn consumers about the risk that the SDM would fail during a frontal crash, and instead indicated that the passenger safety system would function properly. *See* 49 C.F.R. § 571.208 (S4.1.5.4, S4.1.5.5) (Federal motor vehicle safety standards requiring Occupant Restraint Systems with airbags and seatbelts).

112.   Vehicle manufacturers have a duty to disclose known safety defects to the public and to NHTSA. When a vehicle manufacturer learns of a safety defect, federal law requires it to disclose the defect to NHTSA and to the owners, purchasers, and dealers of the vehicle. 49 U.S.C. § 30118(c). Indeed, GM Parent acknowledges these obligations in its public SEC filings. In its Form 10-K for fiscal year 2019, GM Parent states: "If we or NHTSA determine that either a vehicle or

vehicle equipment does not comply with a safety standard or if a vehicle defect

creates an unreasonable safety risk, the manufacturer is required to notify owners

and provide a remedy."

113.   The interiors of the Class Vehicles also contain prominent labels that

alert the driver and passengers to the vehicle's airbag system. For example, steering

wheels and passenger dashboards typically have labels identifying the airbag and

safety restraint system (or "SRS").

114.   GM was also specifically required to include in their vehicles warning

labels that alerted consumers of the need to perform airbag maintenance. For

example, S4.5.1 of 49 C.F.R. § 571.208 states:

> Air bag maintenance or replacement information. If the
> vehicle manufacturer recommends periodic maintenance or
> replacement of an inflatable restraint system, as that term
> is defined in S4.1.5.1(b) of this standard, installed in a
> vehicle, that vehicle shall be labeled with the
> recommended schedule for maintenance or replacement.
> The schedule shall be specified by month and year, or in
> terms of vehicle mileage, or by intervals measured from
> the date appearing on the vehicle certification label
> provided pursuant to 49 CFR Part 567. The label shall be
> permanently affixed to the vehicle within the passenger
> compartment and lettered in English in block capital and
> numerals not less than three thirty-seconds of an inch high.
> This label may be combined with the label required by
> S4.5.1(b) of this standard to appear on the sun visor.

115.   Plaintiffs are unaware of any label in any Class Vehicle that alerted

consumers to the SDM Calibration Defect or the need to perform maintenance to

protect the SDM from preventing airbag deployment or seatbelt tightening when they are needed.

116.   GM also distributed the Class Vehicles with so-called "Monroney" labels (also known as "window stickers") that described the equipment and safety features of the vehicles, including airbags. Dealers sell Class Vehicles to consumers with these labels visible. An image of a Monroney label for the 2012 Silverado is included below as a representative example. In the center of the image, it features a "Five Star" frontal crash rating for drivers. Under "Safety & Security" features, it touts the "dual stage" airbags.



117.   Monroney labels for many of the Class Vehicles are available at: https://monroneylabels.com. Additional exemplars of Monroney labels from some of the Class Vehicles are attached as Exhibit B.

118.   As demonstrated by these examples, Monroney labels uniformly assured consumers that the Class Vehicles had working airbags and seatbelts. This information would have suggested to any reasonable consumer that the passenger safety system did not suffer from a defect and would perform its intended function of activating the seatbelts and airbags during a frontal collision.

119.   Had GM disclosed the defective nature of the SDM software calibration on the Monroney labels or other labels or marketing for the Class Vehicles, Plaintiffs and Class members would have seen that disclosure.

**2.    GM published owners' manuals for the Class Vehicles that detailed their safety features but did not disclose the SDM Calibration Defect.**

120.   GM (and Old GM before it) published owners' manuals for each of the Class Vehicles. These manuals were directed at consumers and included misleading statements regarding seatbelts, airbags, and passenger safety systems. These statements uniformly omitted any warning to consumers that the SDM could effectively shut off during a crash after just 45 milliseconds.

121.   Representative examples of statements from owners' manuals with materially misleading omissions concerning the effectiveness of their airbags follow in the paragraphs below.

122.   The manual for the 2002 Cadillac Escalade provides extensive detail about the vehicle's airbags, including the below details and images. In addition to explaining the types of airbags and where they are located, the manual specifically alerts consumers that the airbags "are designed to inflate in moderate to severe frontal or near-frontal crashes" where "the impact speed is above the system's designed 'threshold level.'" As to frontal airbags, it explains that they have been "designed to help reduce the risk of injury from the force of an inflating airbag."

## Supplemental Restraint Systems (SRS)

This part explains the frontal and side impact Supplemental Restraint Systems (SRS) or air bag systems.

Your vehicle has four air bags -- a frontal air bag for the driver, another frontal air bag for the right front passenger, a side impact air bag for the driver, and another side impact air bag for the right front passenger.

Frontal air bags are designed to help reduce the risk of injury from the force of an inflating frontal air bag. But these air bags must inflate very quickly to do their job and comply with federal regulations.

**When should an air bag inflate?**

The driver's and right front passenger's frontal air bags are designed to inflate in moderate to severe frontal or near-frontal crashes. But they are designed to inflate only if the impact speed is above the system's designed "threshold level."

If your vehicle goes straight into a wall that doesn't move or deform, the threshold level is about 9 to 16 mph (14 to 26 km/h). The threshold level can vary, however, with specific vehicle design, so that it can be somewhat above or below this range.

If your vehicle strikes something that will move or deform, such as a parked car, the threshold level will be higher. The driver's and right front passenger's frontal air bags are not designed to inflate in rollovers, side impacts, or rear impacts, because inflation would not help the occupant.

**How the Air Bag Systems Work**

**Where are the air bags?**



The driver's frontal air bag is in the middle of the steering wheel.



The right front passenger's frontal air bag is in the instrument panel on the passenger's side.

The driver's side impact air bag is in the side of the driver's seatback closest to the door.

123.   The manuals for the 2009 Chevy Traverse and 2010 Buick Enclave include similar details and images. Like the manual for the 2002 Cadillac Escalade, they also assure consumers that the vehicle's airbags are "designed to help reduce the risk of injury from the force of an inflating bag" and, thus, that the aggressive deployment problems that plagued first-generation airbags had been alleviated.  It also assures that the frontal airbags have been "designed to inflate in moderate to severe frontal crashes to help reduce the potential for severe injuries…." It continues that airbag "deployment thresholds are used to predict how severe a crash is likely to be in time for the airbags to inflate and help restrain the occupants." While it gives very specific detail on the way the passenger safety systems should function, the manual notably fails to say that the deployment thresholds are wholly and

-72-

intentionally ignored just 45 milliseconds into a crash sequence, preventing the airbags and seatbelts from functioning when they need to.

## Airbag System

The vehicle has the following airbags:

- A frontal airbag for the driver.
- A frontal airbag for the right fron passenger.
- A seat-mounted side impact airbag for the driver.
- A seat-mounted side impact airbag for the right front passenger.
- A roof-rail airbag for the driver, passenger seated directly behind the driver, and the third row outboard passenger position.
- A roof-rail airbag for the right front passenger, passenger seated directly behind the right front passenger, and the third row outboard passenger position.

All of the airbags in the vehicle will have the word AIRBAG embossed in the trim or on an attached label near the deployment opening.

For frontal airbags, the word AIRBAG will appear on the middle part of the steering wheel for the driver and on the instrument panel for the right front passenger.

With seat-mounted side impact airbags, the word AIRBAG will appear on the side of the seatback closest to the door.

With roof-rail airbags, the word AIRBAG will appear along the headliner or trim.

Airbags are designed to supplement the protection provided by safety belts. Even though today's airbags are also designed to help reduce the risk of injury from the force of an inflating bag, all airbags must inflate very quickly to do their job.

## When Should an Airbag Inflate?

Frontal airbags are designed to inflate in moderate to severe frontal or near-frontal crashes to help reduce the potential for severe injuries mainly to the driver's or right front passenger's head and chest. However, they are only designed to inflate if the impact exceeds a predetermined deployment threshold. Deployment thresholds are used to predict how severe a crash is likely to be in time for the airbags to inflate and help restrain the occupants.

Whether the frontal airbags will or should deploy is not based on how fast your vehicle is traveling. It depends largely on what you hit, the direction of the impact, and how quickly your vehicle slows down.

## Where Are the Airbags?



The driver frontal airbag is in the middle of the steering wheel.



The right front passenger frontal airbag is in the instrument panel on the passenger side.

124.   The manual for the 2014 GMC Acadia provides additional detail about how the passenger safety system functions. It explains that "Airbags are designed to inflate if the impact exceeds the specific airbag system's deployment thresholds." Yet again, however, the manual does not indicate that the SDM and its sensors are

-73-

rendered useless in multi-impact crashes that endure for longer than a specific, 45 millisecond time frame.



**Where Are the Airbags?**

The driver frontal airbag is in the center of the steering wheel.



The front outboard passenger frontal airbag is in the passenger side instrument panel.



If the vehicle has a front center airbag, it is in the inboard side of the driver seatback.

**When Should an Airbag Inflate?**

This vehicle is equipped with airbags. See *Airbag System on page 3-23*. Airbags are designed to inflate if the impact exceeds the specific airbag system's deployment threshold. Deployment thresholds are used to predict how severe a crash is likely to be in time for the airbags to inflate and help restrain the occupants. The vehicle has electronic sensors that help the airbag system determine the severity of the impact. Deployment thresholds can vary with specific vehicle design.

Frontal airbags are designed to inflate in moderate to severe frontal or near frontal crashes to help reduce the potential for severe injuries, mainly to the driver's or front outboard passenger's head and chest.

Whether the frontal airbags will or should inflate is not based primarily on how fast the vehicle is traveling.

It depends on what is hit, the direction of the impact, and how quickly the vehicle slows down.

Frontal airbags may inflate at different crash speeds depending on whether the vehicle hits an object straight on or at an angle, and whether the object is fixed or moving, rigid or deformable, narrow or wide.

Frontal airbags are not intended to inflate during vehicle rollovers, rear impacts, or many side impacts.

In addition, the vehicle has advanced technology frontal airbags. Advanced technology frontal airbags adjust the restraint according to crash severity.

The front center airbag, if equipped, is designed to inflate in moderate to severe side crashes depending upon the location of the impact, when either side of the vehicle is struck. In addition, the front center airbag is designed to inflate when the sensing system predicts that the vehicle is about to roll over on its

side. The front center airbag is n... designed to inflate in frontal impacts, near frontal impacts, or rear impacts.

Seat-mounted side impact airbag... are designed to inflate in modera... to severe side crashes dependin... on the location of the impact. Seat-mounted side impact airbag... are not designed to inflate in fro... impacts, near frontal impacts, rollovers, or rear impacts. A seat-mounted side impact airb... is designed to inflate on the side... the vehicle that is struck.

Roof-rail airbags are designed to inflate in moderate to severe side... crashes depending on the locatio... of the impact. In addition, these roof-rail airbags are designed to inflate during a rollover or in a severe frontal impact. Roof-rail airbags are not designed to infla... rear impacts. Both roof-rail airba... will inflate when either side of th... vehicle is struck, if the sensing

### 3. GM marketed the Class Vehicles to be safe and reliable but failed to mention the SDM Calibration Defect.

125. Like its other consumer-facing representations, GM's advertisements for the Class Vehicles left out a crucial part of the story. By uniformly omitting any

information about the SDM Calibration Defect, GM misled consumers into believing that their airbags would function properly in a crash, despite its knowledge to the contrary.

126.   A 2013 press release about the 2014 Chevy Silverado 1500, GMC Sierra, and Sierra Denali 1500 is further illustrative of GM's misleading statements about the Class Vehicles. Acknowledging that safety is "as important to truck buyers as it is to car buyers," Gay Kent, GM general director of Vehicle Safety and Crashworthiness, stated that the "Silverado and Sierra set a benchmark for pickup truck safety by offering a full array of advanced features designed to protect occupants before, during and after a collision." The press release noted the vehicle's "[s]ix standard air bags and 360-degree sensor system, including dual-stage frontal air bags, head-curtain side-impact air bags with rollover protect, and front outboard seat-mounted side-impact air bags."

127.   Brochures and press releases for other Class Vehicles use similar language to send a misleading message of safety. Illustrative examples are described below.

a.   Beginning with the 1999 Chevy Blazer, GM promised to go "to the ends of the earth to bring you driving security," assuring "peace of mind" with its "mainstay features such as Next Generation driver and right-front-passenger airbags."

-75-

b.      "Because safety and security are so important to your family,"
the brochure for the 2002 Chevy Astro reads, "Astro features a comprehensive
system to help you feel secure while you're driving." Among other safety features,
"[s]tandard driver and front-passenger air bags . . . [are] designed to give you peace
of mind. Chevy Astro. It's the midsize van that's serious about safety and security."

c.      The brochure for the 2006 GMC Yukon promises, "should the
worst happen, your Yukon will protect you and your passengers with front and rear
crush zones, a sturdy steel safety cage, up to four air bags and a host of other
important safety features."

d.      The brochure for the 2008 Buick Enclave explains that "[s]afety
and protection were top priorities in the design of the Enclave" and touts the
vehicle's "360° perimeter safety system [that] will deploy the appropriate airbags."

e.      Promising "[f]eelings of security and confidence," the brochure
for the 2009 Chevy Equinox states the vehicle's "dual-stage frontal and head-curtain
side-impact air bags" helped earn it "the highest possible government rating for
frontal crash tests – five stars."

f.      Declaring that "[s]afety never goes out of style," the brochure for
the 2009 Chevy Traverse highlights the vehicle's "five-star frontal and side-impact
crash test ratings" and its "six air bags that help protect all three rows of seating."

g.      A press release for the 2009 Cadillac Escalade ESV goes further, proclaiming that the "Escalade is designed to be among the industry's safest and most secure vehicles, with numerous safety systems and crash-avoidance technologies."

h.       "Speaking of safety," the brochure for the 2010 Buick Enclave reads, "Enclave has earned an impressive five-star crash rating for both front and side impacts . . . . Five-star rating is for the driver and front passenger seating positions in the frontal crash test and for the front and rear seating positions in the side-impact crash test."

i.      The brochure for the 2010 GMC Terrain describes the vehicle as "the state of the art in air bags" and contends that "[s]egment-best safety is anticipated, with features that include . . . six standard air bags: dual frontal airbags; head curtain side air bags and pelvic/thorax seat-mounted side airbags."

j.      A press release for the 2011 Cadillac Escalade Hybrid explains, "[f]ront-image airbags for the driver and passenger have been designed to protect the head during a frontal crash."

k.      According to the brochure for the 2011 Cadillac SRX, "[p]assenger safety is a primary consideration throughout the engineering process." If an incident occurs, "the SRX looks out for you and yours," with its "six standard airbags, including advanced, frontal dual-stage and seat mounted side-impact airbags

for the driver and front-seat passenger, as well as first- and second- row outboard head-curtain airbags."

l.      Describing Buick's "holistic[]" approach to safety, the brochure for the 2012 Enclave proclaims "Enclave's approach to safety helps you and your companions feel safe and secure before, during and after your travels." Inside the vehicle, "all rows have curtain side-impact air bags with rollover protection, along with driver and front-passenger side-impact and dual-sage airbags."

m.      In a 2013 press release announcing that NHTSA gave "its highest possible 5-star Overall Score" to a number of Chevrolet vehicles, including the Traverse and the Silverado, Kent said "We design safety and crashworthiness into our vehicles very early in development." He continued, "We are committed to offering advanced safety technologies on a broad range of models . . . . All of our vehicles are designed to provide continuous protection for customers before, during and after a crash."

n.      A press release for the 2013 Buick Enclave likewise publicized Buick's safety record: "In 2012, every Buick model was named a Top Safety Pick by the Insurance Institute for Highway Safety, underscoring the brand's commitment to safety leadership. The 2013 builds on that distinction with the industry's first front center side air bag – a standard feature."

o.    "With head curtain side-impact air bags reaching from the front to the third row of seating for outboard passengers," the 2014 brochure for the GMC Yukon XL reads, "Yukon is engineered to help protect passengers regardless of where they're seated."

p.    Claiming to "set[] the standard . . . in everything from safety to performance," the brochure for the 2014 Cadillac Escalade touts the vehicle's "eight standard airbags," including "[d]ual-stage driver and front passenger, front-impact, Automatic Occupant Sensing System, driver and front passenger seat-mounted side-impact airbags for thorax and pelvic protection and head-curtain side-impact airbags with rollover protection for all outboard passenger rows."

q.    The brochure for the 2014 Buick Enclave promises that the vehicle has "your back, front and sides, proclaiming that "in an industry first, the standard driver's seat side-mounted front center air bag adds another layer of protection by providing cushioning between you and your front passenger to help reduce injuries in side impacts." The brochure includes the below picture, indicating that the airbags will function as expected.



128.    Based on information and belief, every single Class Vehicle advertisement omitted *any* mention that the vehicles' airbags and seatbelts could fail in a serious frontal collision due to the SDM Calibration Defect.

\* \* \*

129.    GM's deceptive actions harmed Plaintiffs and the Class. As a result of GM's unfair, deceptive, and/or fraudulent business practices, and failure to disclose that the Class Vehicles carried a dangerous safety defect that would cause the passenger safety systems to shut off during certain types of accidents, owners and lessees of the Class Vehicles have lost money and/or property.

## V.   CLASS ACTION ALLEGATIONS

130.    This case is about GM's legal responsibility for its knowledge, conduct, and products. The proposed Class members' claims all derive directly from a single course of conduct by GM. The objective facts are the same for all Class members. Within each Claim for Relief asserted by the respective proposed Classes, the same

legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims.

131.   Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

### A.   The Class Definition

132.   The "Class Vehicles" herein include all vehicles in the United States that contain the SDM Calibration Defect that were (1) manufactured, sold, distributed, or leased by Defendants or (2) manufactured, sold, distributed, or leased by Old GM and purchased or leased by Plaintiff or a Class member after July 10, 2009.

133.   On information and belief, the SDM Calibration Defect exists in all GM trucks and SUVs starting with model year 1999.  This would include, for example, trucks and SUVs such as the Silverado, Tahoe, Astro, and Trailblazer.

Discovery will reveal when, if ever, GM discontinued use of the SDM Calibration Defect in its trucks and SUVs.

134.   The proposed Nationwide Class includes all persons and entities that purchased or leased a Class Vehicle in the United States, including its territories. Plaintiffs also propose separate Classes as follows: State Classes for California, Florida, Louisiana, Michigan, North Carolina, Ohio, and Texas, each of which includes all persons and entities that purchased or leased a Class Vehicle in that state.

135.   Excluded from the Classes are:

a.      Defendants' officers, directors and employees and participants in the Porsche Associate Lease Program; Defendants' affiliates and affiliates' officers, directors, and employees; Defendants' distributors and distributors' officers, directors, and employees; and

b.      Judicial officers and their immediate family members and associated court staff assigned to this case.

136.   Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or otherwise modified.

### B.    Numerosity: Federal Rule of Civil Procedure 23(a)(1)

137.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are millions of Class Vehicles and Class members nationwide. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

### C.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

138.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These include, without limitation, the following:

a.    Whether the Class Vehicles' SDM software calibration is defective, as described herein;

b.    Whether Defendants knew, or should have known, about the SDM Calibration Defect, and, if so, how long they have or should have known about it;

c.    Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.      Whether Defendants' concealment of the SDM Calibration Defect caused Plaintiffs and Class members to act to their detriment by purchasing or leasing the Class Vehicles;

e.      Whether Defendants' certifications concerning vehicle safety were misleading considering the risk that the SDMs will not trigger airbags and seatbelts during certain types of collisions;

f.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

g.      Whether Defendants misrepresented that the Class Vehicles were safe;

h.      Whether the Defendants concealed that SDM Calibration Defect;

i.      Whether Defendants' statements, concealments, and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices, in trade or commerce, by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag components;

-84-

k.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

l.      Whether Defendants' concealment of the true defective nature of the Class Vehicles caused their market price to incorporate a premium reflecting the assumption by consumers that the Class Vehicles were equipped with fully functional passenger safety systems and, if so, the market value of that premium; and

m.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

**D.      Typicality: Federal Rule of Civil Procedure 23(a)(3)**

139.    Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class member purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

### E.    Adequacy: Federal Rule of Civil Procedure 23(a)(4)

140.    Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automobile defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### F.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

141.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### G.    Superiority: Federal Rule of Civil Procedure 23(b)(3)

142.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims

against Defendants such that it would be impracticable for members of the Classes to individually seek redress for Defendants' wrongful conduct.

143.   Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

144.   Defendants have known of the SDM Calibration Defect since at least 2009, when GM learned, through books, records, and personnel, that Old GM had launched the defective algorithm despite clear warnings of the risk of doing so, and then continued to use that defective software thereafter. They obtained further knowledge of the risks of the SDM Calibration Defect from lawsuits and multiple suspicious accidents (involving airbag and seatbelt failures in frontal accidents) occurring in practically every year since, which provided additional and confirmatory notice of the continued risks of the SDM Calibration Defect.

145.   Despite this knowledge, for years, Defendants did not disclose the seriousness of the issue and in fact concealed the prevalence of the problem. In so

doing, Defendants have failed to warn consumers, initiate timely recalls, or inform NHTSA, as GM is obligated to do.

146.    Defendants had a duty to disclose the SDM Calibration Defect to consumers and NHTSA. Contrary to this duty, GM concealed the defect by continuing to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the Class members; to advertise the safety of the Class Vehicles; and to fail to notify regulators or the Plaintiffs and the Class members about the true nature of the Class Vehicles.

147.    Due to the highly technical nature of the SDM Calibration Defect, Plaintiffs and Class members were unable to independently discover it using reasonable diligence. Prior to the retention of counsel and without third-party experts, Plaintiffs and Class members lack the necessary expertise to analyze the software algorithm for the SDMs and to understand its defective nature.

148.    Accordingly: (1) Defendants' fraudulent concealment tolls the statute of limitations; (2) Defendants are estopped from relying on the statute of limitations; and (3) the statute of limitations is tolled by the discovery rule.

## VII.  CAUSES OF ACTION

### A.     Claims Asserted on Behalf of the Nationwide Class

#### NATIONWIDE COUNT I:
#### FRAUD BY CONCEALMENT
#### (Common Law)

149.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

150.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, as there are no true conflicts among various states' laws of fraudulent concealment. Defendants are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).  In the alternative, Plaintiffs bring this claim on behalf of the State Classes.

151.    Defendants intentionally and knowingly concealed and suppressed material facts from regulators and consumers regarding the SDM Calibration Defect that causes the airbags and seatbelts to fail in prolonged onset, complex, or otherwise multi-impact accidents, causing a serious risk or injury or death.

152.    A reasonable consumer would not have expected that the Class Vehicles contained a software program that was calibrated to prevent seatbelt tightening and airbag deployment during certain types of frontal crashes. Defendants knew that reasonable consumers expect that their vehicle has working

airbags and seatbelt pretensioners, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

153.    Defendants ensured that Plaintiffs and the Class did not discover this information through actively concealing it and misrepresenting the Class Vehicles' safety systems without disclosing the truth. Defendants intended for Plaintiffs and the Class to rely on their omissions—which they did by purchasing and leasing the Class Vehicles at the prices they paid.

154.    Defendants had a duty to disclose the SDM Calibration Defect because:

a.    GM had exclusive and/or far superior knowledge and access to the facts about this hidden and complex safety defect. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    GM knew the SDM Calibration Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class members' decisions to buy or lease Class Vehicles;

c.    GM is subject to statutory duties to disclose known safety defects to consumers and to NHTSA; and

   d.     GM made incomplete representations about the safety and

          reliability of the Class Vehicles and their passenger safety

          systems, while purposefully withholding material facts about a

          known safety defect. In uniform advertising and materials

          provided with each Class Vehicle, Defendants intentionally

          concealed, suppressed, and failed to disclose to Plaintiffs and the

          Class that the Class Vehicles contained the dangerous SDM

          Calibration Defect. Because they volunteered to provide

          information about the Class Vehicles that they offered for sale to

          Plaintiffs and the Class, Defendants had the duty to disclose the

          whole truth. They did not.

155.   To this day, Defendants have not made full and adequate disclosure,

continue to defraud Plaintiffs and the Class, and continue to conceal material

information regarding the SDM Calibration Defect. The omitted and concealed facts

were material because reasonable person would find them important in purchasing,

leasing, or retaining a new or used motor vehicle, and because they directly impact

the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.

156.   Defendants actively concealed or suppressed these material facts, in

whole or in part, to maintain a market for their vehicles, to protect profits, and to

avoid recalls that would hurt the brand's image and cost money. They did so at the

expense of Plaintiffs and the Class. Had they been aware of the SDM Calibration Defect in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs and the Class either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them.

157.    Accordingly, Defendants are liable to Plaintiffs and the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

158.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of Plaintiffs' and the Class' rights and well-being; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### NATIONWIDE COUNT II:
### UNJUST ENRICHMENT
### (Common Law)

159.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

160.    Plaintiffs assert this Unjust Enrichment count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

161.    By reason of their conduct, Defendants caused damages to Plaintiffs and Class members.

162. Plaintiffs and Class members conferred a benefit on the Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' concealment of the SDM Calibration Defect and misrepresentations regarding the Class Vehicles' safety.

163. As a result of Defendants' fraud and deception, Plaintiffs and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from the Defendants' misconduct.

164. Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with a SDM Calibration Defect for more than what the vehicles were worth, at the expense of Plaintiffs and Class members.

165. Defendants readily accepted and retained these benefits from Plaintiffs and Class members.

166. It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the SDM Calibration Defect to consumers. Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them, had Defendants not concealed the SDM Calibration Defect.

167. Plaintiffs and Class members do not have an adequate remedy at law.

168.    Equity cannot in good conscience permit the Defendants to retain the benefits that they derived from Plaintiffs and Class members through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of the Defendants' unjust enrichment is necessary.

**B.    State-Specific Claims**

i.    **California**

**CALIFORNIA COUNT I:**
**Violation of California Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750,** *et seq.*
**(On Behalf of the California State Class)**

169.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

170.    Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against the Defendants.

171.    Plaintiffs and California State Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

172.    Defendants, the California Plaintiffs, and California State Class members are "persons" within the meaning of Cal. Civ. Code § 1761(c).

173.    The Class Vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

174.   The California Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770.

175.   Defendants engaged in unfair or deceptive acts or practices when, in the course of their business they, among other acts and practices, intentionally and knowingly made materially false representations regarding the reliability, safety, and performance of the Class Vehicles and/or the defective SDM software calibration, as detailed above.

176.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive business practices as defined in Cal. Civ. Code § 1770(a):

> a.   Representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have.
>
> b.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not.
>
> c.   Advertising the Class Vehicles and/or with the intent not to sell or lease them as advertised.

      d.     Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

177.   Additionally, in the various channels of information through which Defendants sold and marketed Class Vehicles, Defendants failed to disclose material information concerning the Class Vehicles, which they had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed above: (a) Defendants knew about the defect in the SDM software calibration in the Class Vehicles; (b) Defendants had exclusive knowledge of material facts not known to the general public or the other California State Class members; (c) Defendants actively concealed material facts concerning the software calibration from the general public and Plaintiffs and California State Class members; and (d) Defendants made partial representations about the Class Vehicles that were misleading because they did not disclose the full truth.

178.   Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and California State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

179.   Plaintiffs and the other California State Class members have suffered injury in fact and actual damages resulting from Defendants' material omissions.

180.   Defendants' violations present a continuing risk to Plaintiffs and California State Class members, as well as to the general public, and therefore affect the public interest.

181.   Defendants are on notice of the issues raised in this count and this Complaint by way of notice letters sent by Plaintiffs to Defendants on May 12, 2021 in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendants of their alleged violations of Cal. Civ. Code § 1770(a) and demanding that Defendants correct or agree to correct the actions described therein within thirty (30) days of the notice letter. Defendants failed to remedy their unlawful conduct within the requisite time period, and continue to fail to do so.[46]

182.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs and California State Class members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the CLRA.

---

[46] In addition to the May 12, 2021 certified mailing, Plaintiffs also personally served the notice letter on General Motors Company's designated agent for service in Michigan via personal service on June 14, 2021, and sent certified mail copies to the registered agents for service in Delaware for General Motors Company and General Motors Holdings LLC on June 12, 2021.

183.    Attached hereto as Exhibit C are the venue affidavits required by

CLRA, Cal. Civ. Code § 1780(d).

**CALIFORNIA COUNT III:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200,** *et seq***.**
**(On Behalf of the California State Class)**

184.    Plaintiffs reallege and incorporate by reference all preceding allegations

as though fully set forth herein.

185.    Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count,

"Plaintiffs") bring this claim on behalf of themselves and the California State Class

against all Defendants.

186.    The California Unfair Competition Law ("UCL"), Cal. Bus. and Prof.

Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or

practices."

187.    Defendants' knowing and intentional conduct described in this

Complaint constitutes unlawful, fraudulent, and unfair business acts and practices in

violation of the UCL. Specifically, Defendants' conduct is unlawful, fraudulent, and

unfair in at least the following ways:

a.    by knowingly and intentionally concealing from Plaintiffs and

California State Class members that the Class Vehicles suffer

from the SDM Calibration Defect while obtaining money from

the California State Class members;

-98-

b.      by marketing Class Vehicles as possessing a functional, safe, and

defect-free passenger safety system.

c.      by purposefully designing and manufacturing the Class Vehicles

to contain a defective SDM software calibration that causes

airbags and seatbelts to fail in certain accidents contrary to what

was disclosed to regulators and represented to consumers who

purchased or leased Class Vehicles, and failing to fix the SDM

Calibration Defect free of charge; and

d.      by violating the other California laws alleged herein, including

the False Advertising Law, Consumers Legal Remedies Act,

California Commercial Code, and Song-Beverly Consumer

Warranty Act.

188.   Defendants' misrepresentations, omissions, and concealment were

material to the California Plaintiffs and California State Class members, and

Defendants misrepresented, concealed, or failed to disclose the truth with the

intention that consumers would rely on the misrepresentations, concealment, and

omissions.

189.   Defendants' material misrepresentations and omissions alleged herein

caused Plaintiffs and the California State Class members to make their purchases or

leases of their Class Vehicles. Absent those misrepresentations and omissions,

Plaintiffs and California State Class members would not have purchased or leased these vehicles, or would not have purchased or leased these Class Vehicles at the prices they paid.

190.    Accordingly, Plaintiffs and California State Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

191.    Defendants' violations present a continuing risk to Plaintiffs and California State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

192.    Plaintiffs requests that this Court enter an order enjoining Defendants from continuing their unfair, unlawful, and/or deceptive practices and restoring to members of the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345, and for such other relief set forth below.

**CALIFORNIA COUNT IIIII:**
**Violations of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500,** *et seq***.**
**(On Behalf of the California State Class)**

193.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

194.     Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count,

"Plaintiffs") bring this claim on behalf of themselves and the California State Class

against all Defendants.

195.     The California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code

§ 17500, prohibits false advertising.

196.     Defendants, Plaintiffs, and California State Class members are

"persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

197.     Defendants violated the FAL by causing to be made or disseminated

through California and the United States, through advertising, marketing and other

publications, statements regarding the safety of the Class Vehicles that were untrue

or misleading, and which were known, or which by the exercise of reasonable care

should have been known to Defendants, to be untrue and misleading to consumers,

including California State Class members. Numerous examples of these statements

and advertisements appear in the preceding paragraphs throughout this Complaint

and in Exhibit B.

198.     The misrepresentations and omissions regarding the reliability and

safety of Class Vehicles as set forth in this Complaint were material and had a

tendency or capacity to mislead and create a false impression in consumers, and

were likely to and did in fact deceive reasonable consumers, including Plaintiffs and

California State Class members, about the true safety and reliability of Class

Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

199. In purchasing or leasing their Class Vehicles, the California State Class members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations turned out not to be true because the Class Vehicles are distributed with a dangerous safety defect, rendering the vehicles' airbags and seatbelts inoperative in certain types of accidents.

200. Plaintiffs and the other California State Class members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. Had they known the truth, Plaintiffs and California State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

201. The California Plaintiffs and California State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and California State Class members did not, and could not, unravel Defendants' deception on their own.

202. Defendants had an ongoing duty to Plaintiffs and California State Class members to refrain from unfair or deceptive practices under the California False

Advertising Law in the course of their business. Specifically, the Defendants owed Plaintiffs and California State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and California State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

203. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

204. Defendants' violations present a continuing risk to Plaintiffs and California State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

205. Plaintiffs request that this Court enter an order enjoining Defendants from continuing their unfair, unlawful, and/or deceptive practices and restoring to the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**CALIFORNIA COUNT IVV:**
**Breach of Express Warranty**

## Cal. Com. Code §§ 2313 and 10210
### (On Behalf of the California State Class)

206.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

207.    Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

208.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

209.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

210.    All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

211.    All California State Class members who leased Class Vehicles in the California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

212.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

213.    In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiffs and California State Class members with written express

warranties covering the repair or replacement of components that are defective in materials or workmanship.

214. Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and California State Class members unknowingly purchased or leased Class Vehicles that came equipped with a SDM Calibration Defect.

215. However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and California State Class members.

216. Plaintiffs and California State Class members reasonably relied on Defendants' express warranties when purchasing or leasing their Class Vehicles.

217. Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and California State Class members.

218. Defendants were provided reasonable notice of these issues and an opportunity to cure the breaches of their express warranties by way of a letter sent by Plaintiffs on May 12, 2021.

219.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

220.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

### CALIFORNIA COUNT V:
### Breach of Implied Warranty of Merchantability
### Cal. Com. Code §§ 2314 and 10212
### (On Behalf of the California State Class)

221.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

222.   Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

223.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

224.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

225.   All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

-106-

226.   All California State Class members who leased Class Vehicles in the California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

227.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

228.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

229.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

230.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

231.   Defendants were provided reasonable notice of these issues and an opportunity to cure the breaches of their express warranties by way of a letter sent by Plaintiffs on May 12, 2021.

232.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

233.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT VI:**
**Violation of Song-Beverly Consumer Warranty Act,**
**Breach of Implied Warranty**
**Cal Civ. Code § 1790, *et seq*.**
**(On Behalf of the California State Class)**

234.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

235.   Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

236.   All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

237.   All California State Class members who leased Class Vehicles in California are "lessors" within the meaning of Cal. Civ. Code § 1791(h).

238.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

239.    Defendants are the "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

240.    Defendants impliedly warranted to Plaintiffs and the other members of the California State Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

241.    The Class Vehicles would not pass without objection in the automotive trade due to the SDM Calibration Defect. Because the Class Vehicles contain defective SDMs, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

242.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the SDM Calibration Defect. The Class Vehicles do not conform to the promises and affirmations made by the Defendants regarding safety.

243.    The Defendants' breach of the implied warranty of merchantability caused damage to Plaintiffs and California State Class members who purchased or leased the defective Class Vehicles. The amount of damages due will be proven at trial.

244.    Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and California State Class members seek an order enjoining Defendants' unfair and/or

-109-

deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**CALIFORNIA COUNT VII:**
**Violation of the Song-Beverly Consumer Protection Act,**
**Breach of Express Warranty**
**Cal Civ. Code § 1790,** *et seq.*
**(On Behalf of the California State Class)**

245.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

246.    Plaintiffs Arthur Ray and Mark Silver (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

247.    All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

248.    All California State Class members who leased Class Vehicles in California are "lessors" within the meaning of Cal. Civ. Code § 1791(h).

249.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

250.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

251.    Defendants are and were at all relevant times "sellers" of motor vehicles under Cal. Civ. Code § 1791(l).

-110-

252.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Civ. Code § 1791(i).

253.    Defendants made express warranties to members of the California State Class within the meaning of California Civil Code §§ 1791.2 and 1793.2.

254.    In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiffs and California State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

255.    Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and California State Class members unknowingly purchased or leased their Class Vehicles equipped with a SDM Calibration Defect.

256.    However, Defendants knew or should have known that their warranties were false and misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and California State Class members.

257.    Plaintiffs and California State Class members reasonably relied on Defendants' express warranties when purchasing or leasing the California Class Vehicles.

258.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and California State Class members.

259.   Plaintiffs and California State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent on May 12, 2021.

260.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

261.   As a result of Defendants' breach of their express warranties, members of the California State Class received goods whose defect substantially impairs their value to Plaintiffs and the other members of the California State Class. Plaintiffs and members of the California State Class have been damaged as a result of, inter alia, the diminished value of Defendants' products.

262.   Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

263.    Pursuant to California Civil Code § 1794, the Class is entitled to costs and attorneys' fees.

ii.    **Florida**

**FLORIDA COUNT I:**
**Violations of the Florida Unfair & Deceptive Trade Practices Act**
**Fla. Stat.  §  501.201,** *et seq.*
**(On Behalf of the Florida State Class)**

264.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

265.    Plaintiff William Garrison (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Florida State Class against all Defendants.

266.    Plaintiff and members of the Florida State Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

267.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

268.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

-113-

269.    In the course of their business, Defendants violated the FUDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

270.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Fla. Stat. § 501.204(1).

271.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Florida State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

272.    Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and Florida State Class members, as the Defendants intended. Had they known the truth, Plaintiff and Florida State Class members would not have

purchased or leased the Class Vehicles, or would have paid significantly less for them.

273.   Plaintiff and Florida State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Florida State Class members did not, and could not, unravel Defendants' deception on their own.

274.   Defendants had an ongoing duty to Plaintiff and Florida State Class members to refrain from unfair or deceptive practices under the FUDTPA in the course of their business. Specifically, Defendants owed Plaintiff and Florida State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Florida State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

275.   Defendants' violations present a continuing risk to Plaintiff and Florida State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

276.   Pursuant to Fla. Stat. § 501.211, Plaintiff and Florida State Class members seek an order enjoining Defendants' unfair or deceptive acts or practices

and awarding damages and any other just and proper relief available under the
FUDTPA.

277.   Plaintiff and the Florida State Class suffered ascertainable loss and
actual damages as a direct and proximate result of Defendants' misrepresentations
and concealment of and failure to disclose material information.

278.   Plaintiffs and the Florida State Class are entitled to recover their actual
damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat.
§ 501.2105(1).

279.   Plaintiffs and the Florida State Class also seek an order enjoining
Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief,
attorneys' fees, and any other just and proper relief available under the FUDTPA.

**FLORIDA COUNT II:**
**Breach of Express Warranty**
**Fla. Stat. § § 672.313 and 680.21**
**(On Behalf of the Florida State Class)**

280.   Plaintiffs reallege and incorporate by reference all preceding allegations
as though fully set forth herein.

281.   Plaintiff William Garrison (for the purposes of this count, "Plaintiff")
brings this claim on behalf of himself and the Florida State Class against all
Defendants.

282.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

283.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat.  § 680.1031(1)(p).

284.   All Florida State Class members who purchased Class Vehicles in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

285.   All Florida State Class members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

286.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

287.   In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiff and Florida State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

288.   Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and Florida State Class members unknowingly purchased or leased Class Vehicles that came equipped with a SDM Calibration Defect.

289.   However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM

Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Florida State Class members.

290.   Plaintiff and Florida State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

291.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Florida State Class members.

292.   Plaintiff and Florida State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiff on May 12, 2021.

293.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

294.   As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and Florida State Class members have been damaged in an amount to be proven at trial.

### FLORIDA COUNT III:
### Breach of Implied Warranty of Merchantability

## Fla. Stat. § § 672.314 and 680.212
### (On Behalf of the Florida State Class)

295.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

296.  Plaintiff William Garrison (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Florida State Class against all Defendants.

297.  Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

298.  With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

299.  All Florida State Class members who purchased Class Vehicles in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

300.  All Florida State Class members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

301.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

302.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

303.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

304.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on May 12, 2021.

305.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

306.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Florida State Class members have been damaged in an amount to be proven at trial.

### iii.   Louisiana

**LOUISIANA COUNT I:**
**Violations of the Louisiana Unfair Trade Practices and**
**Consumer Protection Law**
**La. Stat. Ann. § 51:1401,** *et seq.*
**(On Behalf of the Louisiana State Class)**

307.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

-120-

308. Plaintiff Ashley DeGruy (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Louisiana State Class against all Defendants.

309. Defendants, Plaintiff, and the Louisiana State Class are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8)

310. Plaintiff and Louisiana State Class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

311. Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

312. The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

313. In the course of their business, Defendants violated the Louisiana CPL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

314. Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants

engaged in one or more unfair or deceptive business practices prohibited by La. Rev. Stat. § 51:1405(A).

315.   Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Plaintiff and Louisiana State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

316.   Defendants' scheme and concealment of the SDM Calibration Defect in the Class Vehicles were material to the Plaintiff and Louisiana State Class members, as Defendants intended. Had they known the truth, Plaintiff and Louisiana State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

317.   Plaintiff and Louisiana State Class members had no way of discerning that the Defendants' representations were false and misleading and/or otherwise learning the facts that the Defendants had concealed or failed to disclose. Plaintiff and Louisiana State Class members did not, and could not, unravel the Defendants' deception on their own.

318.   Defendants had an ongoing duty to Plaintiff and Louisiana State Class members to refrain from unfair or deceptive practices under the Louisiana CPL in the course of their business. Specifically, Defendants owed Plaintiff and Louisiana State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Louisiana State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

319.   Defendants' violations present a continuing risk to Plaintiff and Louisiana State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

320.   Plaintiff and the Louisiana State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

321.   Pursuant to La. Rev. Stat. § 51:1409, Plaintiff and the Louisiana State Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**LOUISIANA COUNT II:**
**Breach of Implied Warranty of Merchantability/**
**Warranty Against Redhibitory Defects**
**La. Civ. Code Art. 2520, 2524**
**(On Behalf of the Louisiana State Class)**

322.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

323.   Plaintiff Ashley DeGruy (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Louisiana State Class against all Defendants.

324.   Defendants are and were at all relevant times merchants with respect to motor vehicles.

325.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

326.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

-124-

327.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on May 12, 2021.

328.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

329.    As a direct and proximate result of Defendants' breach of the warranty of merchantability, Plaintiff and Louisiana State Class members have been damaged in an amount to be proven at trial.

### iv.    Michigan

**MICHIGAN COUNT I:**
**Violations of the Michigan Consumer Protection Act**
**Mich. Comp. Laws  §  445.903,** *et seq.*
**(On Behalf of the Michigan State Class)**

330.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

331.     Plaintiff Kissy Elliott (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Michigan State Class against all Defendants.

332.    Plaintiff and Michigan State Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

333.    Defendants are "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

334.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).

335.   In the course of their business, Defendants violated the Michigan CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

336.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Mich. Comp. Laws § 445.903:

    a.   Representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

    b.   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

    c.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

    d.   Failing to reveal the defective SDM calibration, which could not reasonably be known by the consumer;

    e.    Making a representation of fact or statement of fact regarding the safety of the Class Vehicles, which is material to the lease or purchase of the Class Vehicles, such that consumers reasonably believe the represented or suggested state of affairs to be other than it actually is; and

    f.    Failing to reveal the SDM Calibration Defect in light of representations of fact regarding the safety of the Class Vehicles made in a positive manner.

Mich. Comp. Laws §§ 445.903(1)(c), (e), (g), (s), (bb), and (cc).

337.   Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Michigan State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

338.   Defendants' scheme and concealment of the SDM Calibration Defect in the Class Vehicles were material to Plaintiff and Michigan State Class members, as Defendants intended. Had they known the truth, Plaintiff and Michigan State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

339.   Plaintiff and Michigan State Class members had no way of discerning that the Defendants' representations were false and misleading and/or otherwise learning the facts that the Defendants had concealed or failed to disclose. Plaintiff and Michigan State Class members did not, and could not, unravel the Defendants' deception on their own.

340.   Defendants had an ongoing duty to Plaintiff and Michigan State Class members to refrain from unfair or deceptive practices under the Michigan CPA in the course of their business. Specifically, Defendants owed Plaintiff and Michigan State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Michigan State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

341.   Defendants' violations present a continuing risk to Plaintiff and Michigan State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

342.   Plaintiff and the Michigan State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

-128-

343.    Plaintiff and the Michigan State Class seek injunctive relief to enjoin Defendants from continuing its unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $250 for each Michigan State Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

344.    Plaintiff and the Michigan State Class also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants intentionally and willfully misrepresented the reliability and safety of the Class Vehicles and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

### MICHIGAN COUNT II:
### Breach of Express Warranty
### Mich. Comp. Laws § § 440.2313 and 440.2860
### (On Behalf of the Michigan State Class)

345.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

346.    Plaintiff Kissy Elliott (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Michigan State Class against all Defendants.

347.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

348.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

349.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

350.    All Michigan State Class members who purchased Class Vehicles in Michigan are "buyers" within the meaning of Mich. Comp. Laws § 440.2103(1)(a).

351.     All Michigan State Class members who leased Class Vehicles in Michigan are "lessees" within the meaning of Mich. Comp. Laws § 440.2803(1)(n).

352.    In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiff and Michigan State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

353.    Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and Michigan State Class members unknowingly purchased or leased Class Vehicles that came equipped with a SDM Calibration Defect.

354.    However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM

Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Michigan State Class members.

355.   Plaintiff and Michigan State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

356.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Michigan State Class members.

357.   Plaintiff and Michigan State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiff on May 12, 2021.

358.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

359.   As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and Michigan State Class members have been damaged in an amount to be proven at trial.

## MICHIGAN COUNT III:
### Breach of Implied Warranty of Merchantability

## Mich. Comp. Laws § § 440.2314 and 440.2860
### (On Behalf of the Michigan State Class)

360.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

361.    Plaintiff Kissy Elliott (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Michigan State Class against all Defendants.

362.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

363.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

364.   All Michigan State Class members who purchased Class Vehicles in Michigan are "buyers" within the meaning of Mich. Comp. Laws § 440.2103(1)(a).

365.    All Michigan State Class members who leased Class Vehicles in Michigan are "lessees" within the meaning of Mich. Comp. Laws § 440.2803(1)(n).

366.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

367.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

368. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

369. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on May 12, 2021.

370. Alternatively, any opportunity to cure the breach is unnecessary and futile.

371. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Michigan State Class members have been damaged in an amount to be proven at trial.

### v.  North Carolina

**NORTH CAROLINA COUNT V:**
**Violations of the North Carolina Unfair and Deceptive Acts and Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq.***
**(On Behalf of the North Carolina State Class)**

372. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

-133-

373.   Plaintiff Jamar Chism (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the North Carolina State Class against all Defendants.

374.   Plaintiff and North Carolina State Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*. ("NCUDTPA").

375.   Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

376.   The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

377.   In the course of their business, Defendants violated the NCUDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

378.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk

posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in the unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce prohibited by N.C. Gen § 75-16.

379. Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and North Carolina State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

380. Defendants' scheme and concealment of the SDM Calibration Defect in the Class Vehicles were material to Plaintiff and North Carolina State Class members, as the Defendants intended. Had they known the truth, Plaintiff and North Carolina State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

381. Plaintiff and North Carolina State Class members had no way of discerning that the Defendants' representations were false and misleading and/or otherwise learning the facts that the Defendants had concealed or failed to disclose.

Plaintiff and North Carolina State Class members did not, and could not, unravel the Defendants' deception on their own.

382.   Defendants had an ongoing duty to Plaintiff and North Carolina State Class members to refrain from unfair or deceptive practices under the NCUDTPA in the course of their business. Specifically, Defendants owed Plaintiff and North Carolina State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and North Carolina State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

383.   Defendants' violations present a continuing risk to Plaintiff and North Carolina State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

384.   Plaintiff and the North Carolina State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

385.   Pursuant to N.C. Gen. Stat. § 75-16, Plaintiff and the North Carolina State Class members and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct,

court costs and reasonable attorneys' fees, and any other just and proper relief
available.

**NORTH CAROLINA COUNT II:**
**Breach of Express Warranty**
**N.C. Gen. Stat. §§ 25-2-313 and 252A-210**
**(On Behalf of the North Carolina State Class)**

386.   Plaintiffs reallege and incorporate by reference all preceding allegations
as though fully set forth herein.

387.   Plaintiff Jamar Chism (for the purposes of this count, "Plaintiff") brings
this claim on behalf of himself and the North Carolina State Class against all
Defendants.

388.   Defendants are and were at all relevant times "merchant[s]" with
respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor
vehicles under § 25-2-103(1)(d).

389.   With respect to leases, Defendants are and were at all relevant times
"lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

390.   All North Carolina State Class members who purchased Class Vehicles
are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103(1)(a).

391.   All North Carolina State Class members who leased Class Vehicles are
"lessees" within the meaning of N.C. Gen. Stat. § 25-2A-103(1)(n).

392.   The Class Vehicles are and were at all relevant times "goods" within
the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

-137-

393.   In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiff and North Carolina State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

394.   Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and North Carolina State Class members unknowingly purchased or leased Class Vehicles that came equipped with a SDM Calibration Defect.

395.   However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and North Carolina State Class members.

396.   Plaintiff and North Carolina State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

397.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and North Carolina State Class members.

-138-

398.    Plaintiff and North Carolina State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiff on May 12, 2021.

399.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

400.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and North Carolina State Class members have been damaged in an amount to be proven at trial.

### NORTH CAROLINA COUNT III:
### Breach of Implied Warranty of Merchantability
### N.C. Gen. Stat. §§ 25-2-314 and 252A-212
### (On Behalf of the North Carolina State Class)

401.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

402.    Plaintiff Jamar Chism (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the North Carolina State Class against all Defendants.

403.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

404.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

-139-

405.   All North Carolina State Class members who purchased Class Vehicles are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103(1)(a).

406.   All North Carolina State Class members who leased Class Vehicles are "lessees" within the meaning of N.C. Gen. Stat. § 25-2A-103(1)(n).

407.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and  25-2A-103(1)(h).

408.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212.

409.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

410.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on May 12, 2021.

411.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

412.    As a direct and proximate result of Defendants' breach of the implied

warranty of merchantability, Plaintiff and North Carolina State Class members have

been damaged in an amount to be proven at trial.

> **vi.    Ohio**

**OHIO COUNT I:**
**Violations of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code § 1345.01, *et seq*.**
**(On Behalf of the Ohio State Class)**

413.    Plaintiffs reallege and incorporate by reference all preceding allegations

as though fully set forth herein.

414.    Plaintiff Matthew Mastracci (for the purposes of this count, "Plaintiff")

brings this claim on behalf of himself and the Ohio State Class against all

Defendants.

415.    Defendants, Plaintiff, and Ohio State Class members are "persons"

within the meaning of Ohio Rev. Code § 1345.01(B).

416.    Each Defendant is a "supplier" as defined by Ohio Rev. Code §

1345.01(C).

417.    Plaintiff and the Ohio State Class are "consumers" as that term is

defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class

Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code §

1345.01(A).

418.    Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

419.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles and/or the defective SDMs, as detailed above. Specifically, Defendants misrepresented the Class Vehicles as safe and/or free from defects and failed to disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, including serious injury or death.

420.    Defendants thus violated the CSPA by, at minimum:

a.    representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

b.    representing that Class Vehicles are of a particular standard, quality, and grade when they are not; and

c.    representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

Ohio Rev. Code § 1345.02(A), (B)(1), (2), and (4).

421.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Ohio State Class.

422.   Defendants knew or should have known that their conduct violated the Ohio CSPA.

423.   Plaintiff and Ohio State Class members had no way of discerning that the Defendants' representations were false and misleading and/or otherwise learning the facts that the Defendants had concealed or failed to disclose. Plaintiff and Ohio State Class members did not, and could not, unravel the Defendants' deception on their own.

424.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the types of acts and omissions of Defendants in this Complaint—including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a substantial defect—constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

    a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    b.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

    c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc*. (OPIF #10002347);

g.    *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.    *Brown v. Spears* (OPIF #10000403);

i.    *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

k.    *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

425.   Defendants owed Plaintiff and the Ohio State Class a duty to disclose the safety risks associated with the SDM Calibration Defect, the true nature of the Class Vehicles, because Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised; intentionally concealed the foregoing from regulators, Plaintiff, and Ohio State Class members; and/or made incomplete representations

about the Class Vehicles' true airbag and seatbelt safety features while purposefully withholding material facts that contradicted these representations.

426.   Defendants' concealment of the true characteristics of the Class Vehicles' safety systems was material to Plaintiff and the Ohio State Class.

427.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Ohio State Class, about the true safety features of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

428.   Defendants' violations present a continuing risk to Plaintiff and the Ohio State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

429.   Plaintiff and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

430.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio State Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled, and attorneys' fees, costs, and any other just and proper relief under the Ohio CSPA.

**OHIO COUNT II:**
**Violations of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code  §  4165.01,** *et seq.*
**(On Behalf of the Ohio State Class)**

431.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

432.   Plaintiff Matthew Mastracci (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

433.   Defendants, Plaintiff, and the Ohio State Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

434.   Defendants engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

435.   The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") prohibits deceptive trade practices.

436.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles and/or the defective SDMs, as detailed above. Specifically, Defendants misrepresented the Class Vehicles as safe and/or free from defects and failed to disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, including serious injury or death.

437.   Defendants thus violated the Act by, at minimum:

-146-

a.  representing that Class Vehicles have characteristics, uses,

benefits, and qualities which they do not have;

b.  representing that Class Vehicles are of a particular standard,

quality, and grade when they are not; advertising Class Vehicles

with the intent not to sell or lease them as advertised; and

c.  advertising the Class Vehicles as safe with the intent not to sell

them as advertised.

Ohio Rev. Code § 4165.02(A)(7), (9), and (11).

438.  Defendants intentionally and knowingly misrepresented material facts

regarding the Class Vehicles with intent to mislead Plaintiff and the Ohio State

Class.

439.  Defendants knew or should have known that their conduct violated the

Ohio DTPA.

440.  Defendants owed Plaintiff and the Ohio State Class a duty to disclose

the safety risks associated with the SDM Calibration Defect, the true nature of the

Class Vehicles, because Defendants possessed exclusive knowledge that they were

manufacturing, selling, and distributing vehicles throughout the United States that

did not perform as advertised; intentionally concealed the foregoing from regulators,

Plaintiff, and Ohio State Class members; and/or made incomplete representations

about the Class Vehicles' true airbag and seatbelt safety features while purposefully withholding material facts that contradicted these representations.

441.   Defendants' concealment of the true characteristics of the Class Vehicles' safety systems was material to Plaintiff and the Ohio State Class.

442.   Plaintiff and Ohio State Class members had no way of discerning that the Defendants' representations were false and misleading and/or otherwise learning the facts that the Defendants had concealed or failed to disclose. Plaintiff and Ohio State Class members did not, and could not, unravel the Defendants' deception on their own.

443.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Ohio State Class, about the true safety features of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

444.   Defendants' violations present a continuing risk to Plaintiff and the Ohio State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

445.   Plaintiff and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices

under the Ohio DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

446. Pursuant to Ohio Rev. Code § 4165.03, Plaintiff and the Ohio State Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

**OHIO COUNT III:**
**Breach of Express Warranty**
**Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313**
**(On Behalf of the Ohio State Class)**

447. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

448. Plaintiff Matthew Mastracci (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

449. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

450. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

451.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

452.   In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiff and Ohio State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

453.   Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and Ohio State Class members unknowingly purchased or leased Class Vehicles that came equipped with a SDM Calibration Defect.

454.   However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Ohio State Class members.

455.   Plaintiff and Ohio State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

456.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also

breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Ohio State Class members.

457. Plaintiff and Ohio State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiff on May 12, 2021.

458. Alternatively, any opportunity to cure the breach is unnecessary and futile.

459. As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and Ohio State Class members have been damaged in an amount to be proven at trial.

460. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Ohio State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## OHIO COUNT IV:
### Breach of Implied Warranty of Merchantability
### Ohio Rev. Code § § 1302.27 and 1310.19
### (On Behalf of the Ohio State Class)

461. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

462.   Plaintiff Matthew Mastracci (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

463.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

464.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

465.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

466.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

467.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

468.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on May 12, 2021.

469.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

470.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Ohio State Class members have been damaged in an amount to be proven at trial.

### vii.    Texas

### TEXAS COUNT I:
### Violations of the Deceptive Trade Practices Act
### Tex. Bus. & Com. Code § 17.41, *et seq.*
### (On Behalf of the Texas State Class)

471.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

472.    Plaintiff Kenith Yates (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Texas State Class against all Defendants.

473.    Plaintiff and the Texas State Class are "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4); Tex. Bus. & Com. Code § 17.41.

474.    Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

475.    Defendants engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

476.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

477.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles, as detailed above.  Specifically, Defendants misrepresented the Class Vehicles as safe and/or free from defects and failed to disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, including serious injury or death. These acts and practices were unconscionable, and to the Texas Plaintiffs' and Texas State Class members' detriment, took advantage of their lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

478.   Defendants thus violated the Act by, at minimum:

a.   representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

b.   representing that Class Vehicles are of a particular standard, quality, and grade when they are not;

-154-

      c.    advertising Class Vehicles with the intent not to sell or lease

          them as advertised.

Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

479.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Texas State Class.

480.   Defendants knew or should have known that their conduct violated the Texas DTPA.

481.   Plaintiff and Texas State Class members had no way of discerning that the Defendants' representations were false and misleading and/or otherwise learning the facts that the Defendants had concealed or failed to disclose. Plaintiff and Texas State Class members did not, and could not, unravel the Defendants' deception on their own.

482.   Defendants owed Plaintiff and the Texas State Class a duty to disclose the safety risks associated with the SDM Calibration Defect, the true nature of the Class Vehicles, because Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised; intentionally concealed the foregoing from regulators and Texas State Class members; and/or made incomplete representations about the

Class Vehicles' airbag and safety features while purposefully withholding material facts that contradicted these representations.

483.   Defendants' concealment of the true characteristics of the Class Vehicles' safety systems was material to Plaintiff and the Texas State Class.

484.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Texas State Class, about the true safety features of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

485.   Defendants' violations present a continuing risk to Plaintiff and the Texas State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

486.   Plaintiff and Texas State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

487.   Pursuant to Tex. Bus. & Com. Code § 17.50, the Texas State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

488.    Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Plaintiff sent notice letters to Defendants informing them of the issues raised in this count and this Complaint on May 12, 2021. The Texas State Class seeks all damages and relief to which it is entitled.

**TEXAS COUNT II:**
**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(On Behalf of the Texas State Class)**

489.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

490.    Plaintiff Kenith Yates (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Texas State Class against all Defendants.

491.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4)

492.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

493.    All Texas State Class members who purchased Class Vehicles are "buyers" within the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a)(1).

494.    All Texas State Class members who leased Class Vehicles "lessees" within the meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

495.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

496.   In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiff and Texas State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

497.   Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and Texas State Class members unknowingly purchased or leased Class Vehicles that came equipped with a SDM Calibration Defect.

498.   However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Texas State Class members.

499.   Plaintiff and Texas State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

500.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect or replace the defective SDMs in the Class Vehicles. Defendants also

breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Texas State Class members.

501. Plaintiff and Texas State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiff on May 12, 2021.

502. Alternatively, any opportunity to cure the breach is unnecessary and futile.

503. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Texas State Class members have been damaged in an amount to be proven at trial.

**TEXAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code § § 2.314 and 2A.212**
**(On Behalf of the Texas State Class)**

504. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

505. Plaintiff Kenith Yates (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Texas State Class against all Defendants.

506. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4)

507.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

508.   All Texas State Class members who purchased Class Vehicles are "buyers" within the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a)(1).

509.   All Texas State Class members who leased Class Vehicles "lessees" within the meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

510.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

511.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

512.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

513.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on May 12, 2021.

514.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

515.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Texas State Class members have been damaged in an amount to be proven at trial.

## VIII. <u>PRAYER FOR RELIEF</u>

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.   An order certifying the proposed Class(es), designating Plaintiffs as the named representatives of the Class(es), designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.   An order enjoining the Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

C.   An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

D.   A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

E.      Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

F.      Any applicable statutory and civil penalties;

G.      An award of costs and attorneys' fees, as allowed by law;

H.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded.

I.      Leave to amend this Complaint to conform to the evidence produced at trial; and

J.      Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## IX.  **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action triable by a jury.

Dated: August 5, 2021      Respectfully Submitted,

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

David S. Stellings
Katherine I. McBride
Jessica A. Moldovan
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
kmcbride@lchb.com
jmoldovan@lchb.com

Richard Heimann (application for admission
forthcoming)
Nimish R. Desai
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery St., 29th Fl
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008
rheimann@lchb.com

-163-

ndesai@lchb.com

Roland Tellis
David Fernandes
Adam Tamburelli
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (214) 520-1181
rtellis@baronbudd.com
dfernandes@baronbudd.com
atamburelli@baronbudd.com

David M. Birka-White
**BIRKA-WHITE LAW OFFICES**
178 E. Prospect Avenue
Danville, CA 94526
Telephone: (925) 362-9999
dbw@birka-white.com

*Counsel for Plaintiffs and the Class*