# EXHIBIT O

**NHTSA ccmMercury Routing Slip**

INFORMATION Redacted PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C . 552(B)(6)

Printed: 2/16/2017

FEB 17 2017

| | | |
|---|---|---|
| **NHTSA #:** ES17-000449 | Rec'd Date: 2/16/2017 | Referred By: NAD-200 |
| XREF #: | Doc Type: CNG | Doc Date: 2/16/2017 |
| Delivery: EML | Address To: | **Due Date: 3/17/2017** |
| S10 #: | DOT/I #: | RMP #: |

**Subject: LETTER FROM SENATOR NELSON ON BEHALF OF CONSTITUENT SAL FARIELLO RE GENERAL MOTOR SAFETY DEFECTS**

| | | |
|---|---|---|
| Ack Date: | Ack By: | |
| Sign Office: DEPUTY DIRECTOR, GOVERNMENTAL AFFAIRS | Signature: ESSIE WAGNER | Signed For: |
| Cleared Date: | Cleared By: | Cleared For: |
| File Loc: | XREF File: | **Closed Date:** |
| Added By: CBUTLER x60180 | Modified By: Chris.Butler | |

Most Recent Comment:

**Author:**

THE HONORABLE BILL NELSON SENATOR
UNITED STATES SENATE
225 EAST ROBINSON STREET, SUITE 410
ORLANDO, FL 32801
Tel: 407-872-7164 Fax: 407-872-7165 E-mail:

| Assigned To | Task | Asgn Date | Deadline | Returned Date |
|---|---|---|---|---|
| NGA-010 | SIGN | 2/16/2017 | | |
| NEF-010 | REPLY | 2/16/2017 | 3/17/2017 | |

RR
2·17·17
UD



# United States Senate
WASHINGTON, DC 20510-0905

BILL NELSON
FLORIDA

February 16, 2017

Mr. David J. Friedman
Administrator
National Highway Traffic and Safety Administration
1200 New Jersey Avenue, Southeast
Washington, District of Columbia 20590

Dear Mr. Friedman:

    Please find enclosed constituent correspondence I recently received. Your review of the issues and direct reply to Sal Fariello would be greatly appreciated.

    Should you have any questions or concerns, please contact my staff assistant, Brendan Guess at the address below.

    Thank you in advance for your assistance with this matter.

Sincerely,

Bill Nelson

BN/bg
182517-2MA

Enclosure

United States Senator Bill Nelson, Landmark Two, 225 East Robinson Street, Suite 410, Orlando, Florida 32801
Telephone: (407) 872-7161 • Toll-Free *in Florida Only* (888) 671-4091 • Fax: (407) 872-7165
http://billnelson.senate.gov

ES17-000449

# Eastern Forensic Science Group

817 S.W. 85th Way
Gainesville, FL  32607
Tel. (352) 331-3703
Cell (352) 212-6754
e mail: easternforensic@earthlink.net

January 27, 2017

Hon. Bill Nelson
United States Senator
716 Senate Hart Office Building
Washington, DC  20510

Re:   General Motors Safety Defects

Dear Senator Nelson:

    Please be advised that I am forwarding a copy of this correspondence to Mr. Preet Bharara, United States Attorney for the Southern District of New York because his office was involved in a deferred prosecution arrangement with General Motors arising out of concealment of safety defects.

    As a consequence of technical consulting work I did recently in connection with an airbag failure case in Virginia, I believe I uncovered several potentially lethal safety defects in millions of GM vehicles. I also believe that the evidence suggests possible civil and criminal violations of the TREAD Act.

    I am enclosing copies of two letters I sent to Mary Barra, CEO of GM. The first letter dated December 5, 2016 included three lists of defects totaling 46 of my opinions. The lists of opinions are enclosed herewith. I had sent the December 5th letter to Ms. Barra on the hope that her public statements about the "new culture" at GM and their supposed new commitment to safety would motivate her to begin an internal engineering investigation and resolve the concerns I expressed without the need for official government compulsion. I had no desire for GM to become the object of a public scandal arising out of government involvement in a problem they could solve quickly of their own volition.

    Evidently, my assumption that the "new" GM culture is distinguishable from the old GM culture was incorrect. Ms. Barra received the December 5, 2016 letter and it was stamped as received by her on December 7th. I received the stamped version of my letter from her attorneys who subsequently took a most hostile position in their

communications with me, thus motivating my December 31st letter to her wherein I expressed my disappointment with GM. Here is why I was so disappointed.

GM's response to me from internal corporate counsel and outside counsel was a dictatorial declaration that they were taking my deposition in the matter of ▮▮▮▮. Since I was a consultant in the case, and not a declared testifying expert, they had no right to a deposition from me, and therefore elected to request of a judge in Virginia an order and a subpoena which they hope to have enforced in Florida by a Florida judge. Such a deposition can only be taken when facts and opinions cannot be obtained from any other source, as per the applicable rules of the court. I had no intention of ever testifying in the ▮▮▮▮ matter and in fact resigned from the plaintiff's case, so GM could not cross examine me in a trial and had no real need for my deposition.

GM filed a motion in Virginia for permission to take my deposition with no notice to me or right to be heard. My local attorney has advised me that the motion constitutes possible fraud on the court because GM's attorneys falsely told the court in their motion papers that they had no other way of getting clarification as to my opinions (my lawyer obtained the motion papers from the court clerk when GM told me after the fact that they filed a motion and that the judge had granted their request). In fact they do have ways to get the information they falsely claim they need.

In multiple emails to GM and their outside counsel I offered to meet with their engineers in an informal setting to answer any questions they might have. I told them that I did not want money for a deposition (which they are required to pay) and that I just wanted to help ensure public safety. I further told them that all the opinions I offered were supported by very detailed written reports submitted by me to plaintiff's counsel and all they needed to do to obtain clarification of my opinions was to read the reports. Based on this, I apprised GM that they had no legitimate basis for deposing me, especially since they have a huge engineering staff which could have reviewed all the defect allegations and resolved any questions. My insistence to GM was that they really did not need anything further from me, since any technical issues could be resolved by their own engineering staff.

Senator Nelson, it is my belief that GM is using the deposition issue as a stalling tactic just as they did with the Takata airbag matter in which they recently got an extension of the recall. If GM had any real interest in doing anything expeditious about my letter to Mary Barra, they would have taken up my offer immediately to informally discuss the technical issues with their engineers. A forced deposition however, will waste months. They are fully aware that I oppose their taking my deposition. Here it is almost February and still there is no forward movement. Even if a Florida judge agreed to enforce a Virginia subpoena, at least another month or two would elapse before the deposition would take place. Then there is a delay waiting for a transcript and for me to

read the transcript and correct errors. And based on my 30 years or so of experience with car manufacturers, what can be expected are vexatious post-deposition Daubert motions, motions in limine, and various personal attacks against me which I will have to answer, thereby consuming more months. **All this will serve to provide cover for GM to claim they could not take action on my defect allegations because they had to complete the process of deposing me.**

I have consulted in over 60 airbag cases against many car companies and possess intimate knowledge of airbag systems as a result of this. No car company has ever succeeded with a Daubert motion against me or a motion in limine. The process of responding to such motions after a deposition however, can consume months. These could be precious months during which people could lose their lives in dangerous vehicles!

I have enclosed a photo of ▮▮▮▮ vehicle after the crash which resulted in a brain injury to him and various injuries to his wife. Of all the airbag cases I have been involved with, this is one of the most egregious because the design of the airbag sensing system in these vehicles is such that the airbag is incapable of deploying in this kind of a crash.

Back in 1980 I was the sole technical consultant in a case called ▮▮▮▮ General Motors, involving millions of defective transmissions. I helped consumers recover $17,000,000. When the NY State Attorney's office asked for my help in a related matter, I provided them with a copy of my report in ▮▮▮▮ free of charge in the public interest. When the State of New Jersey asked me for reprint rights of portions of my book Mugged by Mr. Badwrench in one of their manuals, I gave them the rights free of charge in the public interest. I have in fact done work for the US Attorney in Miami in an airbag case defending a DEA agent, but I want to let it be known that I was paid in that matter.

In the interest of expediting resolution of the safety concerns I have which I stated to Mary Barra, I am willing to provide any information I can to assist your office and the US Attorney in Manhattan. I am willing to give a deposition as to my opinions to the US Attorney here in Florida as soon as possible with no fee involved. I do not want GM or their lawyers present. I believe their presence will only serve to obfuscate and delay. It is my belief that their behavior to date may be a stalling tactic in furtherance of a possible criminal scheme to avoid addressing my defect allegations.

In closing, I wish to add that I have not violated any discovery protective order in providing you with the list of defects. The applicable discovery order specifically states that GM would waive any claim to confidentiality upon filing in the public record certain documents pursuant to a motion. When they filed a motion for permission to depose

Senator Bill Nelson

Page 4

me, they attached all the opinions I sent to Mary Barra; thus there is no confidentiality since it was waived. Consequently, I am now free to discuss all my opinions without violating a protective order.

Furthermore, GM failed to mark all discovery responses "protected and confidential," thereby waiving any claim to confidentiality under the protective order. The discovery responses in the ▮▮▮▮ case are as probative as they are shocking. In several instances I caught them lying, necessitating that they alter their response. In other cases they seem to have suggested that they cannot be required to answer discovery related to how their own vehicles function, since Delphi Electronics manufactured the airbag computer and only Delphi really knows how it works.

I was employed by two car manufacturers early in my career. I would never have offered such an outrageous statement that my employer did not know how our own vehicles worked. Apparently, the "new" GM" seems to be much the same as the old GM – evasive, mendacious, and abusive of their customers' safety needs.

Please let me know how we may work together to seek a fast resolution to my concerns about the many safety defects I have identified.

Sincerely,

*[signature: Sal Fariello]*

Sal Fariello

SF:ng
Enclosures

cc: Mr. Preet Bharara, US Attorney

## Eastern Forensic Science Group

817 S.W. 85th Way
Gainesville, FL 32607
Tel. (352) 331-3703
Cell (352) 212-6754
e mail: easternforensic@earthlink.net

December 31, 2016

PERSONAL AND CONFIDENTIAL

Mary T. Barra
Chairman & CEO
General Motors Company
300 Renaissance Center, Suite L1
Detroit, MI 48243

Re: ███████████████████████████
Circuit Court for Carroll County, Virginia
Case No. ████████████
Defense Counsel: Ricci, Tyrrell, Johnson & Grey

Dear Ms. Barra:

I am enclosing copies of two emails labeled "1" and "2." E mail number 1 provides some basis for why you might consider firing some people and why I am through expecting responsible behavior from GM. E mail number 2 sent to Glenn Jackson states some facts which would seem to suggest that little has changed at GM insofar as the traditional heavy-handed approach is concerned.

Sincerely,

*Sal Fariello*

Sal Fariello

SF:ng
Enclosures

<div style="text-align:center">

**Eastern Forensic Science Group**

817 S.W. 85th Way
Gainesville, FL 32607
Tel. (352) 331-3703
Cell (352) 212-6754
e mail: easternforensic@earthlink.net

</div>

December 5, 2016

Mary T. Barra
Chairman & CEO
General Motors Company
300 Renaissance Center, Suite L1
Detroit, MI 48243

Re: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Circuit Court for Carroll County, Virginia
Case No. ▮▮▮▮▮▮▮▮▮▮▮▮
Defense Counsel: Ricci, Tyrrell, Johnson & Grey

**RECEIVED**
DEC 07 2016
M.T. BARRA

Dear Ms. Barra:

    I am writing to you to alert you to potentially fatal flaws in approximately 2.7 million vehicles built by GM in the 2006 model year. The vehicles include the 2006 Chevy Trailblazer and other GM vehicles, all of which have the same airbag sensing system. In a small overlap angled frontal collision with involvement of the wheel well, the system cannot deploy the airbags. Furthermore, the seat and belt restraints fail to provide adequate restraint, thereby exacerbating the injurious effects of the airbag failure, especially in connection with overweight front seat occupants.

    As a consultant in the above captioned ▮▮▮▮ litigation, I submitted 46 listed opinions identifying the flaws in the restraint system. All of these opinions are included with this letter. They are self-explanatory. The plaintiff, ▮▮▮▮▮▮▮ sustained a brain injury when his 2006 Trailblazer was impacted at the driver's side, resulting in left A-pillar contact when his airbag failed to deploy and his belt restraints failed. The crash was of enormous severity, with a speed change of 38 miles per hour with a line of force in the direction of the A pillar.

Mary T. Barra
Page 2

    I have enclosed a copy of a post-crash photo of ▮▮▮▮ Trailblazer. During the process of discovery in ▮▮▮ I was apprised of various justifications for non-deployment of the airbag communicated through GM's appointed counsel. Apart from the fact that the "justifications" had no merit, I do not believe there is a jury in the world that would look at the enclosed photo of ▮▮▮▮ Trailblazer and fail to conclude that the airbag should have deployed.

    Before I state what I am requesting that you do to rectify the problems I have described, I should tell you a few things about myself. I am the author of <u>Airbag Injuries, Causation & Federal Regulations</u>, as well as other books about crash injuries. The enclosed article about me in Detroit Legal News and my novel <u>Expert Witness</u> states my views about the US court system and expert witnesses generally. I have enclosed part of a December 15, 2014 TIME Magazine article about airbags for which I was extensively interviewed by Bill Saporito. I have written for TRIAL Magazine as per the attached article. I did a 26 city author tour in connection with my book titled <u>Mugged By Mr. Badwrench</u>. The enclosed story about that book in the Detroit Free Press underscores the fact that I have always taken a balanced and fair position regarding General Motors.

    As for what I would ask you to do regarding the vehicle hazards I have described, I am suggesting that you seriously consider offering the owners of all affected vehicles a generous voucher applicable toward the purchase of a new GM vehicle, along with zero percent extended finance terms. I think this approach will serve to expedite getting the dangerous vehicles off the road.

    The aforementioned resolution or some other equitable arrangement would prevent unnecessary injuries and deaths, and could help GM avoid future costly, time consuming litigation and adverse publicity.

    I am willing to assist you in any reasonable way that I can. Please don't hesitate to enlist my aid if you are so inclined. If I do not hear from you within 30 days from the date this letter is delivered, I will assume that General Motors intends to take no remedial action pursuant to my letter.

Sincerely,

*[signature]*

Sal Fariello

SF:ng
Enclosures

▬▬▬▬▬▬▬▬▬▬▬▬

**Summary of Opinions to be offered by Sal Fariello in a deposition subject to amendment based on receipt of additional discovery before such deposition testimony is offered. The opinions stated herein are consistent with the understanding of the technical issues as of the date of this summary and are as complete as possible within the limits of discovery provided by General Motors.**

**September 8, 2016**

1) The mechanism for the injuries to ▬▬▬▬ head was the application of force to the head arising out of contact with the driver side A pillar.
2) ▬▬▬▬ head adversely interacted with the A pillar because of failure of the driver's steering wheel airbag to deploy.
3) The ▬▬▬ crash was of sufficient severity that it should have deployed.
4) The driver's belt restraints and seat were defective in that acting together they improperly permitted excessive forward excursion of Mr. ▬▬▬▬ head toward the A pillar. This excessive forward excursion augmented the head injury mechanisms and exacerbated injury potential.
5) Excessive forward flexion of the driver seatback defeated the operation of the load limiter in the driver belt retractor.
6) The SDM in the ▬▬▬ vehicle falsely reported that Mr. ▬▬▬▬ was not wearing the belts. This false report of non-use of the belts was caused by a defect in manufacturing and assembly of the SDM wiring harness connector.
7) An examination of the driver's and passenger's belts and related hardware shows belt loading witness marks which prove that ▬▬▬▬ was wearing his belt restraints.
8) Eye witness testimony and photographs at the accident scene corroborate that he was wearing his belts.
9) There would have been a greater propensity for the steering wheel airbag to deploy if GM had implemented dual thresholding in the ▬▬▬ vehicle based on SDM reported belt use but GM elected not to implement this function in

the Trailblazer SDM because GM chose to incorporate a cheaper "non-diagnosible" seatbelt buckle switch to reduce the cost of manufacturing.

10) The deployment thresholds for the ▮▮▮▮ airbag were set too high and compromised driver and passenger safety as a result of GM's improper effort to mitigate lawsuits related to relatively low speed deployments of the airbag.

11) The deployment thresholds of the airbag in the ▮▮▮▮ vehicle failed to pass tests predicated on GM's own standard for determining when an airbag should deploy based on mitigation of facial fractures.

12) The deployment threshold did not meet GM's and generally accepted standards for when an airbag should deploy in order to prevent occupant death based on written technical papers and educational videos produced by GM or its employees.

13) Tests performed on an exemplar driver's belt and retractor assembly provide proof that ▮▮▮▮ was wearing his belts.

14) The aforementioned tests prove that the load limiter did not operate in the ▮▮▮▮ belt retractor because it was defeated by a defective seat.

15) The seat used in the Trailblazer failed to meet GM's own stated design standards for belt load distribution into the floor pan of the vehicle.

16) The crash experienced by Mr. ▮▮▮▮ was a left front wheel well impact. This is a very common crash as per the learned literature on the subject.

17) GM knew about the frequency of wheel well crashes but elected to perform no crash tests to verify the performance of the airbags or seatbelts in such a crash.

18) Oblique wheel well crashes are known to result in a greater propensity for serious head injury than in-line front end crashes.

19) Seatbelt load limiters are known to be associated with more serious driver head injury at the A pillar in angled crashes. GM knew this when the Trailblazer was built.

20) The aforementioned defective seat and seatbelt acted as a de facto constant-load load limiter allowing excessive forward torso excursion toward the A pillar thereby resulting in Mr. ███ head injuries.

21) Whereas the Trailblazer had an augmented propensity for head injury on the A pillar, it was all the more necessary for GM to lower the deployment threshold for the airbag and to implement dual thresholding based on belt use.

22) Any assertion that Mr. ███ was culpable for his head injuries because of not wearing his belts is without merit for three reasons:

a) FMVSS 208 assumes that belts are not worn

b) GM contemplated non-use of the belts when they specified to Delphi Electronics that the SDM be capable of implementing dual thresholding based on non-use of the belts.

c) Mr. ███ was in fact actually wearing his belts.


23) Any argument that the crash pulse of the ███ crash was such that it did not justify airbag deployment is nonsense. GM conducted center pole crash tests at 30 miles per hour and the airbag deployed. A comparison of the crash pulse acceleration/time history of the pole crash test and the ███ crash reveals that both crash pulses were essentially identical over the time period during which the airbag would be expected to deploy.


24) Any alleged differences in crash pulse resulting in non-deployment could be attributed to GM's failure to perform an actual vehicle wheel well crash test and to program the pulse data into the SDM's crash library.


25) Notwithstanding GM's failure to program wheel well crash data into the crash library, The similarity between the GM pole crash pulse and the ███ crash pulse would have been

expected to result in an airbag deployment, but did not do so because GM failed to test the actual crash performance of the SDM under circumstances where the two outboard front crash sensors were inactive.

26) Digital logic diagrams describing the mechanization of the SDM indicate that the SDM could not deploy the airbags absent valid signals from the external sensors.

27) The SDM was designed to accommodate 3 sensors, not just the two placed on the vehicles front end.

28) In an unreasonable and dangerous effort to control costs, GM did not install a third sensor which could have been placed in any one of several locations on the vehicle to adequately detect the wheel well crash.

29) GM's various crash tests in pole crashes, etc. wherein they placed accelerometers at many locations on the vehicle, provide proof that a 3rd sensor would have detected the crash and ensured airbag deployment.

30) Acceleration traces of accelerometer output from accelerometers placed at or near the SDM in GM pole crashes prove that the ████ SDM was unable to process a crash pulse signal independent of output from the external sensors even though an adequate signal was available at the SDM location in the vehicle.

31) Failure of the SDM to independently process a crash pulse and deploy the airbag implicates a defective software algorithm; specifically "Algo S-H."

32) GM had the technology to implement single point crash sensing on earlier model vehicles, which vehicles had the ability to detect a very minor rear wheel well crash and deploy the airbag with no external crash sensors required.

33) Whereas the Trailblazer did not lend itself to single point sensing, it was all the more imperative that GM perform actual wheel well crash tests for front wheel well crashes which could be lethal and wherein the front sensors might not be fully activated, especially since GM has taken the official position that deployment of the driver's airbag is completely appropriate in a comparatively trivial rear wheel well crash where no threat of deadly driver interaction with the A pillar is possible.

34) Statements made in the Trailblazer owner manual and in the dealer sales brochure created the consumer expectation that airbag protection would be provided in oblique wheel well crashes.

35) Such statements provided inducement for the ▮▮▮▮ to purchase the Trailblazer.

36) Nobody every warned the ▮▮▮▮ that the vehicle was not tested to provide restraint protection in front wheel well crashes.

37) GM created a written and express warranty in their owner manual and sales literature that the airbag would deploy in the type of crash ▮▮▮▮ experienced.

38) The 2006 Trailblazer was unreasonably dangerous when it was manufactured.

39) GM failed to notify the NHTSA of dangerous defects in the safety systems of the Trailblazer vis a vis oblique front wheel well crashes, and thereby appears to have violated the TREAD ACT.

40) As per their **Statement of Requirements** for the SDM, GM had the ability to re-program the SDM and could have re-called the vehicles and flash programed a more responsive algorithm into the SDM and could have installed a third external crash sensor to ensure deployment of the airbags in oblique wheel well crashes.

41) GM's only apparent motive for not doing this related to the cost of implementing a recall.

## SUPPLEMENTAL

███████████████

Summary of Opinions to be offered by Sal Fariello in a deposition subject to amendment based on receipt of additional discovery before such deposition testimony is offered. The opinions stated herein are consistent with the understanding of the technical issues as of the date of this summary and are as complete as possible within the limits of discovery provided by General Motors.

October 20, 2016

42) A physical inspection of the airbag in the ████ vehicle and the related airbag circuitry revealed that there had been no tampering with the airbag circuitry and there was no resistor placed in the squib circuit to simulate the presence of a deployable airbag. The airbag was not a dummy airbag. Therefore, the vehicle had a deployable airbag when the crash occurred.

### SECOND SUPPLEMENTAL

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Summary of Opinions to be offered by Sal Fariello in a deposition subject to amendment based on receipt of additional discovery before such deposition testimony is offered. The opinions stated herein are consistent with the understanding of the technical issues as of the date of this summary and are as complete as possible within the limits of discovery provided by General Motors.

### November 28, 2016

43) A physical inspection of the front seat occupied by Mrs. ▮▮▮▮ and the seat belts worn by ▮▮▮▮ revealed the following:

   a) The SDM correctly reported that ▮▮▮▮ was wearing the belts and belt loading witness marks corroborated the report of belt use.

   b) The belt load limiter did not reach load limitation and failed to activate.

   c) The seat back frame severely distorted and twisted due to ▮▮▮▮ heavy body mass.

44) The seat installed in the subject Trailblazer and its exemplars was not safe or suitable for use by an overweight occupant in that it could not maintain its structural integrity in an angled crash and allowed for excessive forward excursion of the overweight occupant and exacerbation of crash injury potential.

45) The aforementioned failure to test for and accommodate the unique needs of an overweight occupant appear to be consistent with General Motors heretofore general disregard for the

special needs of a growing population of overweight drivers and occupants as further evidenced by various pending GM airbag cases reviewed by Sal Fariello wherein such failure to address such special needs has resulted in serious injury or death.

46) Preliminary analysis would suggest that the subject Trailblazer and its exemplars may not be amenable to mitigation of safety hazards and should be subject to a nationwide buyback program to remove them from service.

UPS® (1-800-742-5877)

drop off location near you.

Do not use this envelope for:

nd

2 dard

2 y Select®

dwide Expedited®

UPS Express Envelopes may only contain

qualify for the

correspondence,

weigh 8 oz.

those listed

International

- The UPS Express value. Certain ups.com/importa

- To qualify for the UPS Express

Note: Express containing sensitive or cash equivalent

| WEIGHT | LTR | WEIGHT | DIMENSIONAL WEIGHT If Applicable | LARGE PACKAGE |
|---|---|---|---|---|
| | ☒ | | | ☐ |

SHIPPER RELEASE ☐

Shipper authorizes UPS to act as forwarding agent for export control and customs purposes. Shipper certifies that these commodities, technology or software, were exported from the United States, were exported in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

UPS 2nd Day Air

UNITED STATES SENATE

OPEN FOR INSPECTION

SHIPMENT FROM

United States Senate Post Office

Screened by 20 Senate Post Office JAN 31 2017

Screened by 12 Senate Post Office JAN 31 2017

FEB 7 '17 PM 2:29

TELEPHONE 352-331-0877 3703

EASTERN FORENSIC SCIENCE GROUP

817 SW 85TH WAY

GAINESVILLE FL 32607

DELIVERY TO

TELEPHONE 202 224-5274

Senator Bill Nelson

United States Senate

716 Senate Hart Office Bldg. Residential ☐

Washington, DC 20510

New!

UPS 2nd Day Air® 2

1Z 94E 5F4 37 1000 350 1

TRACKING NUMBER

SHIPMENT ID NUMBER 94E5 F479 XV3

0201911252609 6/14 RRD United Parcel Service, Louisville, KY

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

010195101 1/10 PAC United Parcel Service, Louisville, KY



